632 F.2d 1226
 In the Matter of James F. CRIST, Jr., Debtor.
James F. CRIST, Jr., Debtor, in possession, Appellant,
v.
Jane S. CRIST, Appellee.
In the Matter of Frederick H. PINKERTON, Jr., Bankrupt.
Frederick H. PINKERTON, Jr., Appellant,
v.
Betty Jane PINKERTON, Appellee.
 Nos. 78-3575, 79-1114.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 17, 1980.
 
 James W. Penland, Atlanta, Ga., for James F. Crist, Jr.
 Charles A. Ratz, Atlanta, Ga., for Jane S. Crist.
 T. Brian Glass, Wilbur T. Fitzgerald, Atlanta, Ga., for Frederick H. Pinkerton, Jr.
 Joseph J. Burton, Jr., Atlanta, Ga., for Betty Jane Pinkerton.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before RUBIN and POLITZ, Circuit Judges, and POINTER*, District Judge.
 POLITZ, Circuit Judge:
 
 
 1
 These cases were consolidated on appeal because both concern, inter alia, the constitutionality of § 17(a)(7) of the Bankruptcy Act of 1898, codified in 11 U.S.C. § 35(a)(7), which was modified and replaced subsequent to this suit by the Bankruptcy Reform Act of 1978, 11 U.S.C. § 523(a)(5). In each case the district court affirmed findings by the bankruptcy judge that the debts involved were non-dischargeable alimony obligations. For the reasons assigned, we affirm the decision of the district court in each case.
 
 A. The Pinkertons
 
 2
 Betty Jane and Frederick H. Pinkerton were married in Miami, Florida in 1948 and had three children prior to being divorced there in 1969. The Florida divorce decree incorporated two agreements. The first, dated March 1, 1968, required the husband to provide the wife with periodic support and maintenance payments which were subject to increase if the husband's income increased and were to terminate upon the wife's remarriage. This agreement also contained provisions for support of the parties' three children. The second accord, executed on July 11, 1969, reaffirmed the first agreement and provided for a payment of $35,000 in cash as "full and final settlement and division of property between husband and wife." Frederick Pinkerton paid the $35,000, moved to Georgia and later remarried. Subsequently, Betty Jane Pinkerton filed suit in Georgia alleging that her former husband had fallen into arrears, totalling $13,000, under the alimony and child support provisions of the March 1968 accord. That litigation was settled on May 21, 1975, by a compromise agreement which expressly superseded all prior agreements. The compromise provided for the lump sum payment of $10,000 for the alimony and child support arrearage, and the delivery of a promissory note for $30,000 payable in 36 monthly installments of $833.33. The note provided penalties for default, specifically acceleration of the unpaid balance, 8% interest and attorney's fees. The 1975 settlement agreement further provided:
 
 
 3
 The aforesaid promissory note of $30,000 being delivered to the wife as full and final settlement of any and all claims for any and all alimony, support, and all other benefits, rights and privileges to which the wife is now entitled, has been entitled, and may or will be entitled to in the future by virtue of the former Agreements of the parties. Said note represents full, final and absolute settlement of all benefits due the wife under the aforesaid Agreements and Decree of Divorce.
 
 
 4
 In June 1975, the Florida court approved the compromise settlement, amended the Pinkertons' divorce decree to include the new accord, and adopted a stipulation of the parties which declared, in pertinent part:
 
 
 5
 (T)he (settlement) Agreement of May 21, 1975 (is) a true and accurate reflection of (the Pinkertons') intentions as to alimony and other property dispositions to which they have agreed, and that said Agreement is executed pursuant to paragraph 15 of their original Agreement of March 1, 1968.[1]
 
 
 6
 Frederick Pinkerton initially complied with the 1975 agreement by making the $10,000 payment and four monthly payments. He thereafter defaulted and filed a voluntary petition in bankruptcy, listing as a debt, for which he sought a discharge, the balance on the $30,000 note. Betty Jane Pinkerton was granted a summary judgment accelerating the principal balance due, plus interest, but was denied attorney's fees, without prejudice, pending final disposition of the debt-discharge issue. The bankruptcy judge opined that § 17(a)(7) precluded a discharge of the alimony obligation; the district court affirmed this conclusion.
 
 
 7
 On appeal, Frederick Pinkerton poses two alternative theories in support of his claim of entitlement to a discharge. First, he insists that the non-discharge provisions of § 17(a)(7) are inapplicable to his situation because the May 1975 agreement involved a property settlement and not alimony. Second, he asserts that § 17(a)(7) creates an impermissible gender-based classification which is violative of the due process clause of the Fifth Amendment. We discuss these contentions in Parts I, II and III below.
 
 B. The Crists
 
 8
 Jane S. and James F. Crist were granted a divorce by a Georgia court on March 4, 1977. The parties executed a separation agreement, incorporated into the divorce decree, providing that the husband would pay the wife $30,000 in a lump sum upon the sale of their house, or in installments which were to be completed by March 1978. James Crist further agreed to pay Jane Crist: as alimony, the sum of $350 per month until the aforementioned $30,000 was paid in full; $5,000 for attorney's fees she had incurred; and $350 per month for the support of their minor daughter. Both the $30,000 and $5,000 obligations were evidenced by promissory notes. Crist secured these obligations by executing a deed to the house which transferred a security interest to his former wife. He also agreed to transfer certain personal effects, including home furnishings and an automobile.
 
 
 9
 James Crist paid $7,500 in March 1977, $2,500 of which was in payment on the $5,000 attorney fee commitment with the remainder applicable to the $30,000 note. In April 1977, he paid $2,500 on the $30,000 note. During the months of April and May, 1977, he paid the monthly alimony stipends of $350.
 
 
 10
 James Crist made no payments after the May 1977 alimony installment. He filed a bankruptcy petition in July 1977. The issue of the dischargeability of the obligations due Jane Crist was presented to the bankruptcy court, which ruled that none of the above listed obligations were dischargeable. The bankruptcy court found a balance of $22,500 due on the $30,000 note, $2,500 due on the $5,000 attorney's fee note and an accrued arrearage on the $350 monthly alimony payments, through February 1978, of $3,150, and concluded that § 17(a)(7) proscribed a discharge of any of these debts as all were alimentary obligations. The bankruptcy court rejected the contention that § 17(a)(7) created a gender classification inconsistent with the Fifth Amendment and the contention that the obligations at issue constituted a voidable preference under § 60 of the Bankruptcy Act, 11 U.S.C. § 96. The district court, 460 F.Supp. 891, affirmed.
 
 
 11
 On appeal, James Crist asserts the same Fifth Amendment and voidable preference arguments that were presented to the bankruptcy court. We discuss these contentions in Parts III and IV below.
 
 Part I: Alimony or Property Settlement
 
 12
 Two tribunals, the bankruptcy court and the district court, have classified the Pinkertons' May 1975 agreement as an alimony accord. Under the relevant standard of review, findings of fact are not to be disturbed unless clearly erroneous. "The test ... is not whether a different conclusion from the evidence would be appropriate, but whether there is sufficient evidence in the record to (reflect) clear error in the trial judge's findings." Matter of Bardwell, 610 F.2d 228, 230 (5th Cir. 1980). Frederick Pinkerton insists that the facts in the record support his position with the force and urgency required by this standard. Characterization of the $30,000 note as a property settlement unquestionably would make it a dischargeable debt, not subject to § 17(a)(7), which provides in relevant part:
 
 
 13
 A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as ... are for alimony due or to become due, or for maintenance or support of wife or child ....
 
 
 14
 Resolution of this issue requires a determination of the intention of the parties, as reflected by the substance of the agreement, viewed in the crucible of surrounding circumstances as illuminated by applicable state law. In re Nunnally, 506 F.2d 1024, 1027 (5th Cir. 1975); In re Smith, 436 F.Supp. 469, 476 (N.D.Ga.1977); Golden v. Golden, 411 F.Supp. 1076, 1078 (S.D.N.Y.), aff'd, 535 F.2d 213 (2d Cir. 1976).
 
 
 15
 Several facts convince us that the Pinkertons intended the May 1975 compromise to constitute an amended alimony agreement rather than a property settlement. The July 1969 agreement stated that "the husband agrees to pay the wife as full and final settlement and division of property between the husband and the wife, the sum of Thirty-Five Thousand ($35,000.00) Dollars cash." (Emphasis added.) Upon payment of this amount, the property settlement was complete. Before addressing the substantive alimony provisions, including the terms of the $30,000 note, the May 1975 agreement declared that "the parties are desirous of reforming and revising said Agreements and wish to modify same as provided for in paragraph 15 of said Agreement of March 1, 1968." Moreover, the stipulation between the Pinkertons attested to the fact that the May 1975 accord was "executed pursuant to paragraph 15 of their original Agreement of March 1, 1968."
 
 
 16
 The March 1968 agreement involved alimony and child support. The July 1969 instrument related to the property settlement, was concluded and no longer executory when, in May 1975, the alimony arrearage litigation was compromised and settled. The evidence is overwhelming that the $30,000 note Frederick Pinkerton signed and delivered to Betty Jane Pinkerton related to his alimony obligation and was not a part of a property partition.
 
 
 17
 Reference to Florida law, as appropriately made by the district court, confirms this analysis and characterization of the $30,000 note. When disposition of a federal question requires reference to state law, federal courts are not bound by the forum state's choice of law rules, but are free to apply the law considered relevant to the pending controversy. 1A Moore's Federal Practice P 0.325 (2d ed. 1979). Numerous factors support the reference to Florida law. The Pinkertons were married in Florida, resided in Florida and were divorced in Florida. The 1968, 1969 and 1975 agreements were all submitted to the Florida court for approval and inclusion in the Florida divorce decree. The 1975 compromise arose out of litigation looking to the declaration and collection of an arrearage in alimony and child support accruing under the 1968 court-approved alimony and support agreement.
 
 
 18
 In the context of divorce decree modification disputes, Florida courts "are concerned with the substance and not the form of the payments." Fagan v. Lewis, 374 So.2d 18, 20 (Fla.App.1979). Accord, White v. White, 338 So.2d 883 (Fla.App.1976). That the parties may designate payments "alimony" does not necessarily make the payments alimony from a legal standpoint. The opposite must necessarily follow: that one or both parties might label a payment something other than alimony will not change its character if indeed from the substance of the payment it is clearly alimony. The $30,000 note is evidence of Frederick Pinkerton's obligation to pay alimony to Betty Jane Pinkerton and, as such, comes under the aegis of § 17(a)(7).
 
 Part II: Interest and Attorney's Fees
 
 19
 The May 1975 note contained the following provision:
 
 
 20
 (I)n the event any one of the aforesaid thirty-six (36) installments is not made within ten (10) days of the date it is due, then upon written notice to the undersigned and his failure to tender said payment within seven (7) days, the Holder of this Note shall have the right to declare the remaining unpaid installments due, and the right of action on all unpaid installments for principal, plus interest accruing at the rate of eight (8%) per cent per annum on the unpaid principal from the date of such written notice, plus attorney's fees of ten (10%) per cent and all court costs....
 
 
 21
 When Frederick Pinkerton defaulted on his payment schedule, Betty Jane Pinkerton sent a letter demanding payment within seven days, "or the entire unpaid balance of the note will be accelerated."[2]
 
 
 22
 Citing § 63(a)(1) of the Bankruptcy Act, 11 U.S.C. § 103(a)(1),[3] Frederick Pinkerton contends that his former wife is not entitled to interest after the date the petition in bankruptcy was filed. His recitation in brief of the general rule on interest, as it applies to provable fixed liabilities, is correct. See Sexton v. Dreyfus, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244 (1911). He errs, however, when he seeks to apply the limitation of interest rule to non-dischargeable debts. In Bruning v. United States, 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964), the Supreme Court, in holding that taxes subject to the non-discharge provisions of § 17 are not insulated from accruing interest charges, stated:
 
 
 23
 It is undisputed that, under § 17, petitioner remained personally liable after his discharge for that part of the principal amount of the tax debt and pre-petition interest not satisfied out of the bankruptcy estate. The courts below held that, under § 17, petitioner also remained personally liable for post-petition interest on the tax debt, and we find no substantial reason to reverse that holding. Initially, one would assume that Congress, in providing that a certain type of debt should survive bankruptcy proceedings as a personal liability of the debtor, intended personal liability to continue as to the interest on that debt as well as to its principal amount. Thus, it has never been seriously suggested that a creditor whose claim is not provable against the trustee in bankruptcy loses his right to interest in a post-bankruptcy action brought against the debtor personally. In most situations, interest is considered to be the cost of the use of the amounts owing a creditor and an incentive to prompt repayment and, thus, an integral part of a continuing debt. Interest on a tax debt would seem to fit that description. Thus, logic and reason indicate that post-petition interest on a tax claim excepted from discharge by § 17 of the Act should be recoverable in a later action against the debtor personally, and there is no evidence of any congressional intent to the contrary.
 
 
 24
 376 U.S. at 360, 84 S.Ct. at 907. Accord, Hugh H. Eby Co. v. United States, 456 F.2d 923 (3d Cir. 1972); In re Romero, 535 F.2d 618 (10th Cir. 1976).
 
 
 25
 We hold that interest continues to accrue on the alimony obligation as an integral part of that obligation. We likewise hold that the attorney's fee provision is an integral part of the alimony obligation represented by the promissory note. Florida courts will enforce express stipulations for attorney's fees which are integral parts of alimony agreements. See Scott v. Scott, 303 So.2d 683 (Fla.App.1974); Howell v. Howell, 207 So.2d 507 (Fla.1968).
 
 
 26
 We reach the same conclusion with respect to the balance due for attorney's fees in the Crist case. Considering the totality of that situation, we find that the balance due on the note given in evidence of the agreement to reimburse Jane Crist's attorney's fees comes within the ambit of alimony.
 
 Part III: Equal Protection Challenge
 
 27
 Both Pinkerton and Crist invoke the protections of the Fifth Amendment and claim that they should be absolved from paying alimony to their former wives because the non-discharge provision of § 17(a)(7) creates a gender classification which violates the equal protection aspect of the due process clause.[4] They claim that because § 17(a)(7) would allow their former wives to secure a discharge of an alimony or support debt, denying them such a discharge is unconstitutional.
 
 
 28
 Over the past decade the Supreme Court has considered, in a long progression of cases, the vitality of statutes and regulations which classify individuals differently solely on the basis of sex. Frequently, when these laws are reviewed under the magnifying glass of the equal protection clause, their raison d'etre evaporates,[5] resulting in declarations of unconstitutionality.[6] In a recent pronouncement the Supreme Court reiterated the standard under which gender classification statutes must be judged: "(O)ur precedents require that gender-based discriminations must serve important governmental objectives and that the discriminatory means employed must by substantially related to the achievement of those objectives." Wengler v. Druggists Mut. Ins. Co., 446 U.S. 142, 150, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107, 115 (1980).
 
 
 29
 One type of statute containing a gender-based discrimination has passed constitutional muster. The Supreme Court has upheld statutes designed to alleviate "the disparity in economic condition between men and women caused by the long history of discrimination against women." Califano v. Webster, 430 U.S. 313, 317, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977). See also Schlesinger v. Ballard, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); Kahn v. Shevin, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974).
 
 
 30
 In Crist, the district court determined that § 17(a)(7) did create a gender-based distinction involving alimony, but concluded that this provision survived constitutional challenge under the shelter of Kahn. Both appellees before us urge a Kahn analysis in support of their positions. Recourse to a Kahn compensation rationale is helpful and enlightening, but inadequate.[7] Although the Supreme Court has approved statutes which indemnify women for past discrimination, the Court has not accepted blanket declarations of this objective as justification for gender-based distinctions. Rather, the Court requires an investigation as to "whether women (have) in fact been significantly discriminated against in the sphere to which the statute applied a sex-based classification." Orr v. Orr, 440 U.S. 268, 281, 99 S.Ct. 1102, 1112, 59 L.Ed.2d 306 (1979). In Orr, the Court rejected the gender classification in Alabama's alimony laws which limited alimony payments to wives, reasoning that a Kahn compensation justification, which automatically presumes that a woman has suffered discrimination, is insufficient to sustain a gender-biased law when the proceedings envisioned are sufficiently designed to ferret out this information. As the Court said:
 
 
 31
 Under the (Alabama alimony) statute, individualized hearings at which the parties' relative financial circumstances are considered already occur.... (S) ince individualized hearings can determine which women were in fact discriminated against vis a vis their husbands ..., Alabama's alleged compensatory purpose may be effectuated without placing burdens solely on husbands. Progress toward fulfilling such a purpose would not be hampered, and it would cost the State nothing more, if it were to treat men and women equally by making alimony burdens independent of sex.
 
 
 32
 440 U.S. at 281-82, 99 S.Ct. at 1112-13.
 
 
 33
 It has also been suggested[8] that the term "spouse" be substituted for the term "wife," instantly rendering § 17(a)(7) gender neutral.[9] In support of this proposition, we are invited to examine Bank of Marin v. England, 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966), where the Supreme Court addressed the interpretation of the term "transfer" as contained in § 70(d)(5) of the Bankruptcy Act. Noting that "we do not read these statutory words with the ease of a computer," the Court said "(t)here is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." 385 U.S. at 103, 87 S.Ct. at 277. Essentially, this decision counsels liberal construction of the Bankruptcy Act in light of the purpose of the provision under consideration.
 
 
 34
 We find an early expression of the perceived purpose of § 17(a)(7) in Wetmore v. Markoe, 196 U.S. 68, 25 S.Ct. 172, 49 L.Ed. 390 (1904), where the Court was considering the forerunner[10] of the non-discharge provision we now review. While the case involved provability of a debt under the 1898 Bankruptcy Act, the Court discussed the non-dischargeability of a support obligation under the 1903 Bankruptcy Act and stated:
 
 
 35
 The bankruptcy law should receive such an interpretation as will effectuate its beneficent purposes and not make it an instrument to deprive dependent wife and children of the support and maintenance due them from the husband and father, which it has ever been the purpose of the law to enforce.
 
 
 36
 196 U.S. at 77, 25 S.Ct. at 175. As Wetmore indicates, the underlying purpose of the non-discharge status for the support provision was specifically to aid wives and children by insuring that husbands could not disentangle themselves from their support obligations. Since the support provision was designed by Congress in 1903 to aid women, we have neither the authority nor the desire to act for Congress by transforming the term "wife" to "spouse" under the supposed marching orders of Bank of Marin. Moreover, in Westcott, Wiesenfeld and Goldfarb, supra, when faced with interpretative situations identical with that we now face, the Supreme Court declined to substitute the term "surviving spouse" for "widow." Instead, the Court applied an equal protection analysis in scrutinizing the statutes as written. We shall not follow the route suggested by the bankruptcy court in Pinkerton, for the Supreme Court has clearly marked that route as legally impassable.
 
 
 37
 We advance to the final theory tendered in support to § 17(a)(7) which was discussed by the district court in Pinkerton and submitted in the briefs and arguments of both appellees. This argument is premised on the thesis that § 17(a)(7) contains two discrete and independent provisions which are separated by a comma and the disjunctive "or." The critical language of § 17(a)(7) is: "alimony due or to become due, or for maintenance or support of wife or child." The alimony clause portion of the foregoing excerpt contains no reference to either sex and it is forcefully argued that it is gender neutral and therefore constitutional.
 
 
 38
 The district judge in Pinkerton adroitly distinguished alimony and support. Because of our resolution of these disputes we do not reach that question, but note the persuasiveness of his reasoning.[11]The Remedy
 
 
 39
 We conclude that, by providing the benefit of non-dischargeability of debts for alimony and support owed to wives but not to husbands-or, to state it another way, by providing the benefit of dischargeability of such debts owed by wives but not those owed by husbands-s 17(a)(7) violates the equal protection component of the due process clause of the Fifth Amendment. The remaining question is whether to declare the entire subsection a nullity and deny its benefits to both groups, or to extend its coverage and provide equal benefits to both groups. We opt for the latter, following the path blazed by the Supreme Court in, inter alia, Califano v. Westcott, supra, Califano v. Goldfarb, supra, Weinberger v. Wiesenfeld, supra, and Wengler v. Druggists Mut. Ins. Co., supra.
 
 
 40
 In Westcott, the Supreme Court held that § 407 of the Social Security Act, 42 U.S.C. § 607, which provides benefits for dependent children of unemployed fathers but not those of unemployed mothers, violated the due process clause of the Fifth Amendment because it discriminated on the basis of gender. The district court remedy for the constitutional deprivation was the extension of benefits to cover those not included. The Supreme Court affirmed.
 
 
 41
 In Goldfarb, the Court found that the different treatment of men and women mandated by 42 U.S.C. § 402(f)(1)(D) constituted invidious discrimination. The Court found that the provisions of the statute limiting benefits received by a widower to less than those received by a widow were unconstitutional. To correct the constitutional defect, the three-judge trial court ordered that the benefits provided to widows be extended to widowers. The Supreme Court affirmed.
 
 
 42
 In Wiesenfeld, the Court upheld a three-judge court finding that 42 U.S.C. § 402(g), which provided social security survivor's benefits to widows but not to widowers, was unconstitutional. The three-judge court enjoined the continued refusal to pay § 402(g) benefits to widowers solely on the basis of sex. The Supreme Court affirmed.
 
 
 43
 In Westcott, Goldfarb and Wiesenfeld the Court's remedy for the constitutional infirmity of the challenged federal statutes was to extend the benefits to the excluded class.
 
 
 44
 Finally, we note the decision in Wengler which involved a state workers' compensation statute found to violate the Equal Protection Clause of the Fourteenth Amendment. The statute granted a conclusive presumption of dependency to wives but did not grant that presumption to husbands. The Court remanded the case to the state court, noting:
 
 
 45
 We are left with the question whether the defect should be cured by extending the presumption of dependence to widowers or by eliminating it for widows. Because state legislation is at issue, and because a remedial outcome consonant with the state legislature's overall purpose is preferable, we believe that state judges are better positioned to choose an appropriate method of remedying the constitutional violation.
 
 
 46
 446 U.S. at 152, 100 S.Ct. at 1547.
 
 
 47
 We conclude that the proper remedy in the cases at bar is to extend the benefits of § 17(a)(7) to the excluded class. Accordingly, either a husband or wife receiving alimony or maintenance or support may assert the non-dischargeability of the obligation under § 17(a)(7).
 
 Part IV: Voidable Preference
 
 48
 James Crist alternatively contends that the alimony payments due his ex-wife constitute a voidable preference under § 60 of the Bankruptcy Act, 11 U.S.C. § 96. We find this argument totally devoid of merit.Conclusion
 
 
 49
 The judgments of the district courts are affirmed insofar as they hold that the obligations involved are alimony and, as such, are not discharged by virtue of the bankruptcy adjudication. Both cases are remanded in order that the district courts may enter judgment for the principal, interest and, as appropriate, attorney's fees.
 
 
 50
 Each case is AFFIRMED and REMANDED for further proceedings not inconsistent herewith.
 
 
 
 *
 District Judge of the Northern District of Alabama, sitting by designation
 
 
 [1]
 Paragraph 15 of the March 1, 1968 agreement, which established the alimony and child support schedules, stated: "No modification or waiver of any of the terms of this agreement shall be valid unless in writing and executed with the same formality as this agreement."
 
 
 [2]
 We recognize that the bankruptcy and district courts deferred consideration of the attorney's fee question. Because we dispose of all substantive questions, the interest and attorney's fee issues, which are matters of law, are ripe for review and are resolved
 
 
 [3]
 11 U.S.C. § 103(a)(1) provides:
 (a) Debts of the bankrupt may be proved and allowed against his estate which are founded upon (1) a fixed liability, as evidenced by a judgment or an instrument in writing, absolutely owing at the time of the filing of the petition by or against him, whether then payable or not, with any interest thereon which would have been recoverable at that date or with a rebate of interest upon such as were not then payable and did not bear interest.
 
 
 [4]
 In Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), the Supreme Court noted that the Fifth Amendment due process clause contains an equal protection component. Fifth Amendment equal protection claims are considered in exactly the same manner as claims under the Fourteenth Amendment equal protection clause. Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975)
 
 
 [5]
 The Supreme Court has consistently invalidated statutes which create "archaic and overbroad generalizations" about women, Schlesinger v. Ballard, 419 U.S. 498, 508, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975), which automatically assume that women are the weaker sex, Stanton v. Stanton, 421 U.S. 7, 15, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975), and which establish gender-based distinctions "solely for the purpose of achieving administrative convenience", Frontiero v. Richardson, 411 U.S. 677, 690, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973)
 
 
 [6]
 See, e. g., Wengler v. Druggists Mut. Ins. Co., supra ; Califano v. Westcott, 443 U.S. 76, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979); Orr v. Orr, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979); Califano v. Goldfarb, 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977); Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); Stanton v. Stanton, supra ; Weinberger v. Wiesenfeld, supra ; Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); Frontiero v. Richardson, supra ; Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971)
 
 
 [7]
 We disagree with the district court in Crist that a Kahn compensation justification would immunize § 17(a)(7). The Supreme Court applied this rationale only after emphasizing and concluding that a very strong governmental interest was served by the gender classification. Webster, 430 U.S. at 318, 97 S.Ct. at 1195; Ballard, 419 U.S. at 510, 95 S.Ct. 578; Kahn, 416 U.S. at 355, 94 S.Ct. at 1737. In Wengler, the Supreme Court indicated that the government's interest in the area of maintenance and support for spouses is not strong enough to shield the legislation under a Kahn compensation haven. 446 U.S. at 148 n. 4, 100 S.Ct. 1544 n. 4. See also Hull, Sex Discrimination and the Equal Protection Clause: An Analysis of Kahn v. Shevin and Orr v. Orr, 30 Syracuse L.Rev. 639 (1979); Note, Alimony Awards Under Middle-Tier Equal Protection Scrutiny, 59 Neb.L.Rev. 172, 181-85 (1980)
 
 
 [8]
 This argument is raised by Betty Jane Pinkerton and the Bankruptcy Court in Pinkerton
 
 
 [9]
 Section 523(a)(5) of the Bankruptcy Reform Act of 1978, which became operative on October 1, 1979, is analogous to § 17(a)(7) with one exception: It is gender neutral. 11 U.S.C. § 523(a)(5) provides:
 A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt-
 (5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree, or property settlement agreement, but not to the extent that-
 (A) such debt is assigned to another entity, voluntarily, by operation of law, or otherwise; or
 (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support.
 
 
 [10]
 The 1903 amendments to the Bankruptcy Act of 1898, which contained alimony and support non-discharge provisions for the first time, were carried forward and incorporated into the Bankruptcy Act of 1938. They remained substantially unchanged in the 1970 amendments to the Bankruptcy Act of 1938. 1A Collier on Bankruptcy P 17.18, at 1668-69 (14th ed. 1978)
 
 
 [11]
 One must consider the canons of construction which support a distinction between alimony and support, including the doctrine of last antecedent, Quindlen v. Prudential Insurance Company of America, 482 F.2d 876 (5th Cir. 1973); the mandate that courts give effect, whenever possible to all parts of a statute and avoid an interpretation which makes a part redundant or superfluous, General Motors Acceptance Corporation v. Whisnant, 387 F.2d 774 (5th Cir. 1968); and consideration of the use of the disjunctive "or" between two terms, Reiter v. Sonotone Corp., 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979)
 Further, alimony is defined in a gender neutral fashion by the laws of Georgia (Ga.Code Ann. § 30-201) and Florida (Fla.Stat.Ann. § 61.08).
 Finally, there are other significant differences between alimony and maintenance and support. The maintenance and support clause is limited to a segment of the familial unit-wives and children. Alimony, derived from the Latin words "alimonia" and "alere", has long been recognized as including the sustenance, nourishment or support obligations provided by ascendants for descendants, descendants for ascendants, as well as spouses for each other. For example, see Louisiana Civil Code arts. 229, 230 and 231, which provide:
 Art. 229. Reciprocal alimentary duties of ascendants and descendants
 Children are bound to maintain their father and mother and other ascendants, who are in need; and the relatives in the direct ascending line are likewise bound to maintain their needy descendants, this obligation being reciprocal.
 They are also bound to render reciprocally all the services which their situation can require, if they should become insane.
 Art. 230. Scope of alimentary obligation
 By alimony we understand what is necessary for the nourishment, lodging and support of the person who claims it.
 It includes the education, when the person to whom the alimony is due, is a minor.
 Art. 231. Basis for granting alimony
 Alimony shall be granted in proportion to the wants of the person requiring it, and the circumstances of those who are to pay it.
 Additionally, La.Civil Code article 148 details alimentary obligations for the wife in a situation of judicial separation or divorce.
 Civil Code article 229, which establishes reciprocal alimony duties between ascendants and descendants, is found in the Louisiana Civil Code of 1870, the Civil Code of 1825, the predecessor codification of 1808, as well as in the Code of Napoleon of 1804. It is hardly a new kid on the block.