**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**ELMAS TRADING CORPORATION, Republic Overseas Bank, Ltd., James L. Attarian and Donald D. Smith, Defendants.**

**No. CV–R–85–263–ECR.**

United States District Court, D. Nevada.

Dec. 11, 1987.

Robert D. LaFramenta and Maureen Shanahan, Securities and Exchange, Los Angeles, Cal., for plaintiff.

Thomas J. Nolan and Maryann R. Marzano, Los Angeles, Cal., for Elmas Trading Corp. and Republic Overseas Bank, Ltd.

James L. Attarian, pro se.

Jerrold M. Ladar, San Francisco, Cal., for Donald D. Smith.

Michael D. Hoy and Richard M. Traychok, II, Reno, Nev., for Nathan Calhoun, claimant.

## ORDER

EDWARD C. REED, Jr., Chief Judge.

The jurisdiction of this Court was originally invoked in this matter by the Securities and Exchange Commission pursuant to Section 22(a) of the Securities Act, 15 U.S. C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. The Court found at that time that it also had jurisdiction ancillary to its federal question jurisdiction in this case. *J.I. Case Co. v. Borak*, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). By order of this Court dated May 24, 1985, the Receiver was appointed for the defendant corporations, and was directed to trace and marshal all assets of the receivership estate. The Court specifically retained jurisdiction over the action for the purpose of implementing and carrying out all orders necessary for the administration of the Receivership. The Court thus also retained jurisdiction to entertain motions for additional relief including the designation of additional assets as belonging to the Receivership estate.

Such a motion is now before the Court. Upon his application, the Receiver seeks to impose a constructive trust over $90,000 in the possession of the claimant, Nathan Calhoun. The claimant came into possession of these funds by means of a loan transaction entered into with Leslie E. Peck. The Receiver alleges, among other things, that Peck and Calhoun entered into a loan contract which was usurious under applicable law, and that Peck repaid the loan and interest out of Receivership funds which were given to him by Russell B. Smith. On this basis, the Receivership requests that the claimant be named as the constructive trustee of the funds, and that they be returned to the estate. In addition, the Receiver argues that the claimant should be prevented from sharing in any distributions of the Receivership estate, as the loan transaction evinces bad intent on the claimant's part. He is therefore guilty of unclean hands, the Receiver contends, and should not be treated as other investors.

The claimant, on the other hand, contends that the loan was not usurious under applicable law, and that he was therefore a bona fide purchaser. Because of his status as a BFP, the claimant argues that he cannot be named constructive trustee, and that he may properly retain these funds. Further, the claimant states that he was not guilty of unclean hands, inasmuch as the loan transaction was legal under applicable law. On that basis, his claims against the estate must be allowed.

This matter was originally set for hearing on October 26, 1987. Because the parties were unable to agree on a joint prehearing order, the Court ordered that the matter be reset for hearing at the next available date. It appeared to the parties and the Court at that time, however, that the matter could be tried without a hearing, in that most of the critical evidence could be received by stipulation. The Court then ordered the parties to prepare a joint prehearing order, in which they were to stipulate to all issues of fact needed for the resolution of this matter. In addition, the parties were instructed to stipulate, to the extent possible, to all matters of law.

The Court then allowed the parties to file contemporaneous briefs which argued their interpretations of the law and facts. It was indicated at the October hearing that the matter would then be decided upon the basis of the evidence and law presented in these pleadings, and that no further hearing would be required.

FACTS

As set forth in the joint prehearing order, the facts of this matter are as follows. At all times relevant to this dispute, Calhoun was a resident of Arkansas, Peck a resident of Nevada, and Smith a resident of Texas. Russell Smith, an attorney for ROBL, Elmas, and their affiliates and subsidiaries, approached Calhoun regarding investments in ROBL. Smith had his London attorneys, Evans, Dodd, and Summerton, create Magnum Resources on Calhoun's behalf for the sole purpose of investing in ROBL and Elmas. Calhoun invested $34,-500 in Elmas in August, 1984, and another $30,000 in ROBL in January, 1985. Calhoun has filed claims against the Receivership for both the Elmas and ROBL investments.

In January, 1985, Peck contacted Smith in order to borrow $50,000. Smith spoke with Calhoun, his client, regarding such a loan to Peck. Calhoun agreed to loan Peck only $15,000. Smith, acting on behalf of Peck, negotiated the loan terms with Calhoun. All negotiations were carried on over the phone, Smith being in Texas, and Calhoun in Arkansas. Before sending the funds to Smith, Calhoun called Peck in Nevada to assure himself that there was agreement on the essential terms of the loan.

Smith prepared three loan documents in Texas, identified as a "promissory note," a "security agreement," and a "memorandum of agreement." The three writings, construed together, indicated that Calhoun would loan Peck $15,000, and required Peck to repay $90,000 on or before March 31, 1985. The effective interest rate was thus 500%. The loan documents do not specify where repayment was to be made, but the security agreement provided that the law of Arkansas would govern the enforcement of the note. Smith signed the loan documents on Peck's behalf in Texas, and forwarded them to Calhoun. Calhoun then executed the memorandum agreement in Arkansas.

Peck failed to make the repayment in March as required by the agreements, because he was teetering on the brink of bankruptcy at the time. Shortly thereafter, however, Smith gave Peck $500,000 of Receivership funds gratuitously. Following a series of phone calls to Calhoun, Peck repaid the loan between May 16 and 31, 1985. The payments were by means of an initial payment of $25,000 which went directly to Calhoun in Arkansas, and subsequent payments of less than $10,000 which were directed to bank accounts in Minnesota under Calhoun's control. One of Calhoun's reasons for requesting serial payments of under $10,000 was to avoid the reporting requirements of the Internal Revenue Service. It is undisputed that the $90,000 which Calhoun received from Peck was part of the disbursement of $500,000 which Peck had in turn received from Smith. The parties also stipulated that this money was derived from ROBL and Elmas assets.

STIPULATED MATTERS OF LAW

The parties agree that if Arkansas law applies to the Calhoun loan, the transaction was usurious. Article 19, section 13 of the Arkansas Constitution provides for a maximum lawful rate of interest on any contract entered into after 1982, not to exceed 5% per annum above the Federal Reserve Discount Rate at the time of the contract. Under this calculation, the parties agree that the legal rate of interest in Arkansas at the time of their contract was 13%.

The parties further agree that a transaction is usurious under Arkansas law if: (1) that transaction involved a loan or forbearance of money; (2) the borrower had an absolute duty to repay the debt; (3) the cost to the borrower for the use or forbearance of money exceeded the legal rate of interest; and (4) there was an intention on the part of the lender to take or receive more than the maximum legal rate of interest.

In addition, the parties concur that a constructive trust is a remedial device whereby the holder of legal title to property is deemed to be trustee of that property for the benefit of another who is entitled to it. The parties agree that the elements of a constructive trust under Nevada law are: (1) a confidential relationship between the parties; (2) the breach of that confidential relationship was such that the retention of legal title over property held by the breaching party would be inequitable; and (3) the imposition of the constructive trust is essential to the effectuation of justice. The parties stipulate that the $90,000 ultimately paid to Calhoun was previously held by Smith and Peck as constructive trustees.

The parties have finally agreed that where property which is subject to a constructive trust is gratuitously transferred to a donee, the donee holds the property in constructive trust for the equitable owner. Where the transferee is a bona fide purchaser, however, the constructive trust does not extend to him, and the transferred assets may be lawfully retained.

What this action boils down to, therefore, is a determination of whether Calhoun is a bona fide purchaser (BFP). He claims that he is entitled to retain the $90,000, as he had a legal contract for the repayment of money with Peck. The Receiver, on the other hand, argues that the constructive trust should be imposed, as applicable choice of law principles mandate that Arkansas law be applied. Under that law, this contract would be illegal, as the maximum allowable interest in Arkansas at the time the contract was signed was 13%. The determination of the BFP issue is therefore an exercise in choice of law.[1]

## CHOICE OF LAW IN FEDERAL COURTS

The initial problem in this case is deciding which forum's choice of law rules will apply. The parties have apparently assumed that Nevada's choice of law standards will apply, under the rule of *Klaxon v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1940). In that case, the Court held that in diversity cases, federal courts are bound by the doctrine of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1937) to apply state law in choice of law situations. If this were a diversity case, the Court would unhesitatingly follow *Klaxon*. Subject matter jurisdiction for this case is founded not upon diversity, but rather upon a federal question. Because this is a federal securities receivership, this Court's jurisdiction derives from the interpretation of federal law. This conclusion would normally tend to indicate that some federal choice of law principle should apply.

This conclusion would be unwarranted, for a variety of reasons. Not the least of these is the simple fact that there is scarce little federal common law to be found with

---

1. The Court is aware of *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946). In this case, the Court avoided a similar choice of law problem in a bankruptcy proceeding, by finding that federal law prevailed over state law. At issue in that case was whether interest on interest should be allowed to certain bondholders of a corporation undergoing reorganization. The negotiation, signing, and payment of the bonds had contacts with both New York and Kentucky. The lower courts had found that the bankruptcy court should have applied the Kentucky choice of law rule to reach New York local law.

The Supreme Court found that the determination of what claims against the estate are valid and enforceable at the time of the petition is a question that is determined by reference to state law, absent overruling federal law. *Id.*, at 156, 67 S.Ct. at 237. In this case, the Court did find such an overruling federal law. As the Court noted, "[w]hen and under what circumstances federal courts will allow interest on claims against debtor's estates being administered by them has long been decided by federal law." *Id.*, at 163, 67 S.Ct. at 240. The Court thus disallowed the interest on interest claim under federal law.

This case would tend to indicate that this Court could decide the usury issue here without reference to state law. The Court has repeatedly noted the strong similarities between federal receiverships and bankruptcy actions. If Calhoun were a creditor of the estate with respect to the loan transaction, it appears that the Court would be able to determine that claim's validity with respect to prevailing federal bankruptcy guidelines on usurious contracts, as those would represent overruling federal law. The fact that Calhoun is not making a claim against the state, but is rather seeking to retain funds already in his possession, seems to take the case out of the ambit of *Vanston*.

respect to choice of law issues. This is hardly surprising, as choice of law rules only develop where there are conflicts between the laws of different sovereigns. In the federal system, there is really only one sovereign, and thus one sovereign's law. When a conflict arises between federal and state law, the Constitution dictates that federal law must reign supreme. Therefore, to a very large extent, the nature of the federal system obviates the need for choice of laws rules in federal question cases.

Securities receiverships state an exception to this general rule. Because receivers, much like bankruptcy trustees, are required to marshal all assets of the estate for distribution, they are often placed in the position of dealing with the interpretation of state law, as is the case at present. In such cases, however, rather than look to some general federal choice of law principles, the most reasonable alternative for the Court is to turn to state law to resolve the choice of law question.

■ The *Erie* doctrine supports this conclusion. The import of that landmark case was that federal courts should look to state substantive law when considering substantive matters in cases founded upon diversity subject matter jurisdiction. The new doctrine overturned. *Swift v. Tyson*, 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842), and the vast body of federal common law which had grown in the federal courts with respect to state law issues. If one of the purposes of *Erie* was to avoid this unwieldy body of federal common law, and to assure that substantive matters of purely state interest are decided by state law, it thus seems logical to use the state choice of law rules here, rather than to look to federal common law. This policy leads the Court to apply the rule of *Klaxon* to cases founded upon federal question jurisdiction where state law controls the issue to be decided.

In addition, various cases indicate that state choice of law rules should apply to state claims pendent to federal question claims, in order to give full effect to the *Erie* doctrine. *See e.g., Zerman v. Ball,* 735 F.2d 15, 19–20 (2d Cir.1984) (in securities fraud case, federal court applied state choice of law rules to determine the law governing the effect of a choice of law clause in a securities contract); *Rohm and Haas Co. v. Adco Chemical Co.*, 689 F.2d 424, 429 (3d Cir.1982) (in state trade secret case brought pendent to a federal patent action, federal court was required to look to applicable state choice of law principles); *System Operations v. Scientific Games Development Corp.*, 555 F.2d 1131, 1136 (3d Cir.1977) (rule of *Klaxon* applies with respect to pendent jurisdiction claims); *contra, Matter of Crist*, 632 F.2d 1226, 1229 (5th Cir.1980) (in federal bankruptcy proceeding, where disposition of federal question requires reference to state law, federal courts are not required to apply state choice of law rules, but are instead free to apply the law considered relevant to the pending controversy). Although the interpretation of this contract is not technically before the Court strictly as a pendent lawsuit, the distinction is of little weight. In the course of this suit, the Receiver has had to pursue many state law claims against third parties which would have no place in a federal court but for the Receivership. Because all of these claims are brought under the rubric of the Receivership, it seems not too far of a step to classify them as pendent claims, and to decide the choice of law issue under state law.

■ Although the Supreme Court has declined to answer conclusively the question at issue, *see UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 705, n. 8, 86 S.Ct. 1107, 1113, n. 8, 16 L.Ed.2d 192 (1966); *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 371, n. 2, 65 S.Ct. 405, 408, n. 2, 89 L.Ed. 305 (1945); and *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.*, 315 U.S. 447, 456, 62 S.Ct. 676, 679, 86 L.Ed. 956 (1942), various federal rules and cases do support application of the state choice of law rule. The Federal Rules of Evidence, for example, provide that "in civil actions and proceedings, with respect to an element of a claim or defense to which State law supplies the rule of decision, the

privilege of a witness ... shall be determined in accordance with State law." Fed. R.Evid. 501. Thus, even in a federal question case, if a witness seeks to invoke a state privilege, the federal court must look to the whole law of the state in which the court sits, including the state's conflict of law rule. *Laxalt v. McClatchy*, 116 F.R.D. 438, 446 (D.Nev.1987); 2 Weinstein's Evidence, § 501[02], pg. 501–21 (1986); *see also* Fed.R.Evid. 601. One purpose of this rule is to give full effect to the Court's direction in *Erie* that substantive matters of state concern be decided by state law.[2]

■ Similarly, in this case, the Court has been called upon to construe a state contracts defense. Although the basis for the Court's jurisdiction in this receivership is undeniably a federal question, the real issue to be decided in the matter presently before the Court is solely a matter of state law. Because the issue must be decided by reference to state law, the teachings of the Federal Rules of Evidence militate in favor of the application of the state choice of laws rule here as well. *Id.*

Finally, there is a line of cases that indicates that the source of the right at issue, rather than the jurisdictional basis of the court, shall control the choice of law. *Sun Studs, Inc. v. Applied Theory Associates, Inc.*, 772 F.2d 1557, 1561 (Fed.Cir.1985) (the nature of the legal issue, rather than the court's statutory basis for subject matter jurisdiction, determines the choice of law); *Kizzier Chevrolet Co. v. General Motors Corp.*, 705 F.2d 322, 329 (8th Cir.), *cert. denied*, 464 U.S. 847, 104 S.Ct. 153, 78 L.Ed.2d 141 (1983) (in federal question case, where state law supplies the rule of decision, the federal courts are under a duty to ascertain and apply that law); *United States ex rel. Hoover v. Franzen*, 669 F.2d 433, 437 (7th Cir.1982) (*Erie* and its offspring make clear that state law governs state law claims even in non-diversity federal cases, absent a valid and controlling federal law); *Intern. Order of Job's*

*Daughters v. Lindeburg & Co.*, 633 F.2d 912, 915 (9th Cir.), *cert. denied*, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981) (the source of the right sued upon, not the ground on which the federal jurisdiction is invoked, determines whether federal or state law applies). Application of these cases leads the Court to apply the Nevada choice of law rule in this case, as there is no doubt that the validity of the contract is governed by state, rather than federal law.

In contractual disputes, Nevada follows the choice of law approach outlined in the Restatement (Second) of Conflicts (1971). *Laxalt v. McClatchy, supra*, at pg. 749, *Decell v. Northwestern Nat'l Ins. Co.*, 570 F.Supp. 431, 432 (D.Nev.1983); *Ferdie Sievers and Lake Tahoe Land Co., Inc. v. Diversified Mortgage Investors*, 95 Nev. 811, 603 P.2d 270, 273 (1979). In this case, however, the receiver contends that the Court should give effect to the contractual choice of law provision, which indicates that Arkansas law shall apply to the documents. There is no doubt that the parties did choose to have Arkansas law applicable to their dealings. Under the applicable Second Restatement rule, however, this clause of the contract is invalid.

RESTATEMENT SECTION 187

Section 187, of the Restatement (Second) of Conflict of Laws (1971), (Second Restatement) provides in part that the law of the state chosen by the parties to govern their contractual rights and obligations will be applied, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of section 188, would be the state of the applicable law

---

2. Section 501, as proposed by the Advisory Committee, would have left the federal courts free to apply federal law on privilege issues in cases founded solely upon federal question jurisdiction. 2 Weinstein's Evidence, section 501[06],

pgs. 501–51, 501–52 (1986). As enacted, however, Rule 501 requires the federal courts to give credence to the state privilege law, even in federal question cases. *Id.*

in the absence of an effective choice by the parties.

This section of the Restatement thus allows the parties to a contract to select the governing law, as long as that selection bears some reasonable relation to them or their bargain, and as long as that choice is not contrary to the state whose law would be applicable under the Restatement approach if there were no choice of law clause.

On this basis, the Receiver argues that the selection of Arkansas law is valid. Initially, Arkansas does have a substantial relationship to this deal, being the home state of the lender. Further, the Receiver argues that application of Arkansas law would not offend a fundamental policy of the state of the otherwise applicable law, because it is the state which law would be applied in absence of a controlling choice of law clause.

■ The Court need not consider the Receiver's contentions in this regard, for, as the claimant correctly indicates, the comments to this section indicate that courts cannot honor choice of law clauses which select law which ultimately declares a contract illegal and invalid. In comment (e) to section 187, the Restatement reporters indicate that where the chosen law declares a contract invalid, the chosen law will not be applied. "To do so," the comment concludes, "would defeat the expectations of the parties which it is the purpose of the present rule to protect. . . . If the parties have chosen a law that would invalidate the contract, it can be assumed that they did so by mistake." Second Restatement, section 187, comment (e) (1971). It therefore appears that the Court must find the choice of law clause inapplicable, as it would require the Court to apply Arkansas law, which would invalidate the entire contract. *Cf. Walling Chemical Co. v. Hart,* 508 F.Supp. 338, 341 (D.Neb.1981) (federal court applying Nebraska's version of section 187 called for full evidentiary hearing on issue of whether parties actually intended for invalidating South Dakota law to govern, as court would be required to reject that choice of law under section 187).

The receiver cites *Atlas Subsidiaries, Inc. v. O & O Inc.,* 166 So.2d 458 (Fla.App. 1964) for the proposition that the parties' chosen law may be applied to invalidate an usurious contract. This reliance is misplaced. As the Reporter's note to section 187 makes clear, all of the relevant contacts in *Atlas* under the section 188 analysis were also with Florida, the state whose law was chosen by the contract. Therefore, even though the contractual choice of law clause could not be used to reach Florida law, the applicable rules of section 188 would have lead to that law anyway. The result in *Atlas* is thus entirely consistent with section 187, for if the contractual clause is invalidated under that section, the section 188 analysis must be applied to determine applicable law.

RESTATEMENT SECTION 188

■ In the absence of an effective choice of law under section 187, the Court must proceed to section 188, which deals with applicable choice of law in the absence of an effective clause. This section provides that

(1) [t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the principles stated in section 6.

(2) [i]n the absence of an effective choice of law by the parties (see section 187), the contacts to be taken into account in applying the principles of section 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) [i]f the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in sections 189–99 and 203.

Based upon the stipulated evidence provided by the parties in the prehearing order, the Count must now determine the applicable 188 factors.

## PLACE OF CONTRACTING

The Restatement indicates that the place of contracting is the place where the last act occurred necessary to give the contract binding effect under the forum's rules of offer and acceptance. Second Restatement, section 188, comment (e), (1971). In this case, the claimant argues that Texas is the place of contracting, for when Russell Smith signed the loan documents in that state on Peck's behalf, the contract was then enforceable against Peck.

It appears to the Court that the place where the contract was signed is irrelevant. Section 188 indicates that the law of the forum regarding offer and acceptance shall determine where the last act occurred which was necessary to make the contract binding. Under Nevada law, loan contracts appear to be outside of the statute of frauds. *See* NRS § 111.220. The writing in this case was thus not necessarily the last item necessary to make this agreement binding, contrary to the claimant's contention.[3] Rather, that last act appears to have been Calhoun's act of accepting over the telephone the deal proposed by Smith and Peck. *Neumer v. Yellow Freight System, Inc.*, 220 Kan. 607, 556 P.2d 202, 204 (1976) (contract is made in the place at which the offeree speaks the words of acceptance into the telephone); *Travelers Insurance Co. v. Workmen's Comp. App. Bd.*, 68 Cal.2d 7, 64 Cal.Rptr. 440, 444, 434 P.2d 992, 996 (1967) (same); *Bank of Yolo v.*

*Sperry Flour Co.*, 141 Cal. 314, 74 P. 855 (1903) (same), 1 Corbin On Contracts, section 79., pg. 341 (1963).

Although it is not exactly clear when this telephone conversation occurred, from the facts presented by the parties, the only reasonable inference which may be drawn from the stipulated facts is that Peck and Smith were the offerors, as they were the original proponents of the deal to begin with. Calhoun must therefore be taken as the offeree. The parties have stipulated to the fact that Calhoun negotiated the entire deal over the phone from his home in Arkansas. He therefore must have spoken the words of acceptance into the phone in that state. Because Calhoun accepted the offer over the phone from Arkansas to Smith and Peck, Arkansas is the place of contracting.

## PLACE OF NEGOTIATION

Because the entire deal was negotiated over the phone, this element is equally split between Arkansas and Texas. The parties have stipulated to the fact that Smith conducted all negotiations in Texas on behalf of Peck, and that Calhoun was in Arkansas during the negotiations. As the claimant points out, this contact is of lesser significance where the parties conduct their negotiations from separate states over the telephone. Second Restatement, section 188, comment (e) (1971). In a case such as this, however, where the contacts are so evenly divided, it seems that the Court must take into account the fact that the contract was at least partially negotiated in Arkansas.

## PLACE OF PERFORMANCE

■ The contract here is silent as to the place of performance. As the claimant indicates, where the contract makes no statement as to place of performance, it is assumed to be the same as the place of making. *See, e.g., Finance America Corp.*

---

**3.** Even if the writing were required to make the contract binding, the last act in that process was Calhoun's signing the documents in Arkansas, for the entire contract would not have been enforceable until that time. Calhoun contends that the last act would have been Smith's signing of the documents in Texas, for that act made the contract enforceable against Peck. The Court rejects this interpretation of the Restate- ment. The relevant section unequivocally states that the place of contracting is the place where the last act occurred which made the contract binding. The Court finds this to mean the last act which made the entire contract binding against all parties. Under this interpretation, the last act would have been Calhoun's signing in Arkansas.

*v. Moyler*, 494 A.2d 926, 929 (D.C.App. 1985). The place of making, as the Court has already determined, was Calhoun's home state, Arkansas. It thus appears that the place of performance for section 188 purposes was also Arkansas.

The Court also considers that the actual conduct of the parties to be relevant in determining the place of performance. In this regard, it appears that Peck repaid $25,000 of the loan to Calhoun in Arkansas. Peck sent the balance of the loan ($65,000) to Calhoun's bank accounts in Minnesota. Although the larger share of the money went to Minnesota, that state has absolutely no other contacts with this transaction. It seems, therefore, that this contact can be discounted, and that the true place of performance is Arkansas.

Under this formulation, it appears that the state with the most significant contacts with this transaction is Arkansas. As is noted in section 188, when the state of negotiation and the state of performance are the same, that state's law is normally applied. In this case, the place of negotiation was split evenly between Texas and Arkansas. The place of performance was Arkansas, and that was also the state of the making of the contract. In view of these three factors, it appears that the balance tips in favor of Arkansas.

RESTATEMENT SECTION 203

■ Because this case deals with usury, however, section 188 does not end the conflicts analysis. The Court must also consider section 203, which was created specifically for usury cases. That section provides that

[t]he validity of a contract will be sustained against the charge of usury if it provides for a rate of interest that is permissible in a state to which the contract has a substantial relationship and is not greatly in excess of the rate permitted by the general usury law of the state of the otherwise applicable law under the rule of section 188.

Second Restatement, section 203 (1971). This contract must be sustained against the usury charge if Nevada is a state with a substantial relationship with the contract, and the contractual rate of interest is not greatly in excess of that of Arkansas.

Even assuming for the moment that Nevada is a state with a substantial relationship, it is clear that the contractual rate of interest in this case is wildly in excess of that allowed under Arkansas law. Under this contract, the claimant received $75,000 in interest on a $15,000 loan in less than three months. This represents a non-annualized return of 500% which is greatly in excess of the 13% annual interest allowed under Arkansas law. Under sections 188 and 203 of the Second Restatement, therefore, Arkansas law applies to this contract, and is illegal under the applicable usury law.

CONSTRUCTIVE TRUST

The claimant further contends, however, that the Receiver may not impose a constructive trust over these funds, as that doctrine may not be used against him. The claimants contentions in this regard are twofold. First, he argues that he must have been in a confidential relationship with Elmas and ROBL in order to be designated as constructive trustee of these funds. In addition, Calhoun contends that the Court's declaration of this contract as usurious does not affect his status as a bona fide purchaser. Because of his status as BFP, Calhoun argues that the constructive trust remedy is improper.

■ As to the first of the claimant's contentions, it is clear that Calhoun need not be in a confidential relationship with Elmas or ROBL to be a constructive trustee. As he himself recognizes, if a donee receives property gratuitously from a person in such a confidential relationship, he may be designated as a constructive trustee. *See Namow Corp. v. Egger*, 99 Nev. 590, 668 P.2d 265, 267 (1983). Smith was in a confidential relationship with both Elmas and ROBL, and improperly took the funds from those entities which he gratuitously transferred to Peck. Peck then gave Calhoun $90,000 of that money, in an attempt to repay his obligation to him. Unless Calhoun is a bona fide purchaser of these funds, therefore, the Peck–Calhoun trans-

fer was also gratuitous, and Calhoun may be designated as constructive trustee.

 Calhoun's second contention is also easily disposed of. The claimant argues that he can still be seen as a BFP, even though this contract was illegal and invalid under applicable law, because he gave value, in good faith, and without notice of any impropriety on the part of his grantor. *See In re Marriage of Allen*, 724 P.2d 651, 657 (Colo.1986). It appears, however, that the declaration of this contract as usurious and illegal under Arkansas law defeats Calhoun's status as a BFP. The claimant has cited the Court no authority which indicates that a person taking under an illegal contract can still be a BFP. Nor can the Court find any legal support for this novel proposition. Where the contract by which the claimant takes his interest has been declared illegal and invalid, the purchase was not made in good faith, and the claimant cannot be a bona fide purchaser. *Berge v. Fredericks*, 95 Nev. 183, 591 P.2d 246, 247 (1979) (purchase must be in good faith).

In addition, without a valid agreement, Peck's transfer of the $90,000 to Calhoun was completely gratuitous. In the absence of a valid, binding contractual obligation, Peck was under no duty to give Calhoun anything, and his transfer to Calhoun was gratuitous. Under Nevada law, therefore, Calhoun may be designated constructive trustee, as he is the gratuitous donee of property which was given him by an individual in a confidential relationship with the beneficial owner. *Namow Corp., supra*, pg. 752.

MOTION TO DENY CLAIMS AGAINST ESTATE

 The Receiver also moves the Court for an order denying Calhoun's claims against the estate with respect to his status as an investor. In this regard, the Receiver argues that Calhoun is guilty of "unclean hands," because of his making an usurious loan with Smith and Peck. The Receiver argues here that Calhoun was "reckless" in negotiating the loan with Smith, because his status as an investment professional should have alerted him to the fact that the loan was potentially usurious. On this basis, the Receiver argues that Calhoun possessed the requisite bad intent to be guilty of unclean hands, and cannot be allowed to share in the distributions of this equity Receivership.

Based upon a preponderance of the evidence, it does not appear from this record that Calhoun is guilty of unclean hands.[4] The Court's holding that the loan transaction was usurious was the result of a highly technical, and extremely close conflicts of law question. If the transaction had had slightly more contacts with the State of Nevada, it is entirely possible that the Court would have applied Nevada law to the contract. This would have naturally led to a finding that the loan was not usurious, and that Calhoun was entitled to retain the whole $90,000. Because of the closeness of this question, the Court cannot find that Calhoun was reckless in this transaction, or that he was guilty of unclean hands. The Receiver's motion to deny Calhoun's claims against the Receivership estate will therefore be denied.

IT IS, THEREFORE, HEREBY ORDERED that the Receiver's motion to direct Nathan Calhoun to disgorge funds to the Receiver is GRANTED. Calhoun is hereby named constructive trustee of the $90,000 in principal and interest which was repaid to him by Les Peck. Calhoun is also hereby ordered to return these funds forthwith to the Receiver.

IT IS FURTHER ORDERED that the Receiver's motion to deny the claims of Nathan Calhoun and Magnum Resources against the Receivership estate is DENIED.

---

4. This holding does not in any way dilute the Court's earlier finding that the loan contract was not made in good faith. The lack of good faith which defeats Calhoun's status as BFP results as a matter of law from the illegal contract. Calhoun's case of bad intent is a factual issue which must be decided by inquiry into his subjective state of mind.