**A.C.K. SPORTS, INC., Plaintiff,**

v.

**DOUG WILSON ENTERPRISES, INC., a/k/a Kadog, Inc. and Doug Wilson, Defendants.**

No. 86 Civ. 4325 (JFK).

United States District Court, S.D. New York.

May 26, 1987.

---

**388**

Rodney A. Brown, Matays Hughes & Brown, New York City, for plaintiff.

M. Bradford Stein, Flemming, Zulak & Williamson, New York City, and Katten, Muchin, Zavis, Pearl, Greenberger & Galler, Chicago, Ill., for defendants; Lawrence H. Lenz, Jr., of counsel.

## OPINION AND ORDER

KEENAN, District Judge:

### Background

Plaintiff, a New York corporation, brings the instant breach of contract case under this Court's diversity jurisdiction. The defendants are an Illinois corporation, and an Illinois domiciliary, and they move to dismiss on grounds of lack of personal jurisdiction. For the reasons set forth below, the defendants' motion is granted.

### Facts

Defendant Doug Wilson is a defenseman for the Chicago Blackhawks of the National Hockey League ("NHL"). Although Wilson plays for the Blackhawks, and has had a successful career to date, he is not technically employed by the team. Rather, Doug Wilson Enterprises ("DWE") is employed by the Blackhawks, and DWE employs Wilson. This difference, presumably done for tax purposes, is not critical for purposes of the motion to dismiss. The Court will refer to Wilson, but this will include DWE. The plaintiff A.C.K. Sports, Inc., ("ACK"), is apparently engaged in the representation of sports figures. The plaintiff's alleged representation of Wilson is at the center of this lawsuit.

In October, 1982, Wilson entered an agency contract with R.D.S. Sports, Ltd., a Canadian corporation. Norman Caplan signed the contract on RDS's behalf.[*] The contract provided that RDS, in conjunction with ACK, had negotiated a player contract for Wilson with the Blackhawks. The Blackhawks contract covered the 1982–83 through 1986–87 seasons. The contract between Wilson and RDS called for RDS and ACK to provide Wilson with various services including the preparation of tax returns and counselling on promotional, tax, legal and investment matters. The plaintiff, ACK, was not a party to the contract, which was negotiated and executed in Illinois. The heart of the agency contract—negotiations and execution of a player contract with the Blackhawks—was to be, or actually had been, performed in Illinois.

RDS and Wilson entered a new agreement in July, 1984. Caplan, the agent whom Wilson wanted negotiating on his behalf, died later that year. In April, 1985, Wilson discovered that Caplan's widow intended to assign the 1982 agency contract to the plaintiff. On April 26, 1985, accounts receivable to RDS and the plaintiff were assigned outright to the plaintiff. The complaint alleges that the defendant has failed to satisfy these debts.

Plaintiff asserts that personal jurisdiction over the defendants is proper for a few reasons. First, plaintiff observes that Wilson has appeared in New York regularly as a member of the Blackhawks when his team plays a road game against the Buffalo Sabres, the New York Rangers or the New York Islanders. The plaintiff's president, Arthur Kaminsky, asserts in two affi-

---

[*] In July, 1984, RDS and Wilson entered a subsequent contract that Wilson alleges superseded the 1982 contract. The 1984 contract, however, does not explicitly supersede the earlier agreement. The 1982 contract is clearly more favorable to the plaintiff's jurisdictional argument than the later agreement. Because the Court must read the facts and inferences in the light most favorable to the plaintiff, the Court will assume for the purposes of this motion that the 1982 contract was still in effect when plaintiff received its assignment. The circumstances of the assignment will be mentioned later in the opinion.

davits that he and Wilson would go to restaurants after games to discuss business. According to Kaminsky, he and Wilson discussed, among other things, investments, Wilson's last will and testament, commercial endorsement opportunities and a tax escrow agreement.

## DISCUSSION

■ In diversity cases, personal jurisdiction is determined by the federal constitution and the law of the forum state in which the federal court sits. *See Arrowsmith v. United Press International*, 320 F.2d 219, 223 (2d Cir.1963). In New York, the Civil Practice Law and Rules ("CPLR") sections 301 and 302 set forth when courts may assert jurisdiction over non-residents and foreign corporations.

■ On a motion to dismiss for lack of personal jurisdiction under FRCP 12(b)(2), the pleadings and affidavits are to be considered in the light most favorable to the plaintiff. *See Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir.1985); *Bialek v. Racal-Milgo, Inc.*, 545 F.Supp. 25, 33 (S.D.N.Y.1982). The plaintiff is only required to make a prima facie showing that the defendants are amenable to suit in New York. *See Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981). After hearing oral argument and carefully reviewing all of the parties' submissions, the Court concludes that the New York long arm statute does not reach the defendants.

## A. Section 301: Doing Business in New York

■ CPLR section 301 provides that, "[a] court may exercise such jurisdiction over persons, property or status as might have been exercised heretofore." Thus, section 301 essentially codifies the case law regarding jurisdiction over foreign corporations as that law existed before the statute's enactment. Accordingly, courts in New York may exercise personal jurisdiction over non-domiciliaries when the defendant is "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'pres-

ence' in this jurisdiction." *Laufer v. Ostrow*, 55 N.Y.2d 305, 309–10, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982); *McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981).

There is no black-letter test regarding the nature or the extent of business that must be done, *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915 (1917), however, New York courts have applied a "simple and pragmatic" test. *Bryant v. Finnish National Airline*, 15 N.Y.2d 426, 432, 260 N.Y.S.2d 625, 628–29, 208 N.E.2d 439, 441–42 (1965). This approach weighs several factors including whether the defendant maintains offices, employees or agents in the state, has a telephone listing in New York, is licensed to do business in or solicits business in the state, maintains bank accounts in the state or has visited New York. *See Berk v. Nemetz*, 646 F.Supp. 1080, 1083 (S.D.N.Y. 1986); *Cambridge Energy Corp. v. Tri-Co Fuels, Inc.*, 637 F.Supp. 1210, 1212 (S.D.N.Y.1986).

■ Defendant DWE is not licensed to do business in New York, nor is it listed in the New York telephone directories. Although there has been some evidence that defendant Doug Wilson maintains a bank account in New York, the maintenance of a bank account does not, without more, constitute "doing business" in the state. *See Grove Valve & Regulator v. Iranian Oil Services*, 87 F.R.D. 93, 95 & n. 4 (1980).

Plaintiff asserts that from the commencement of the Agency Agreement in October, 1982 to 1986, Wilson appeared in the state seventeen times pursuant to his player contract with the Blackhawks. Plaintiff argues that these appearances constitute doing business in New York and relies on *Erving v. Virginia Squires Basketball Club*, 349 F.Supp. 709 (E.D.N.Y. 1972). *Erving*, however, is inappropriate. In that case, basketball great Julius Erving, frequently called "Doctor J," sued the Squires, a Virginia organization that was a member club of the now defunct American Basketball Association ("ABA"). Although the ABA was organized under Delaware law, the league's principal place of business

was in New York. The ABA was listed in the New York City telephone directory, and acted as an agent for the member clubs. The court ruled that the defendant Squires were doing business in New York because of their regular visits to New York to play the New York Nets, as well as the Squires' connection with the ABA. In addition, the court relied on the regular and continuous visits of club officials to New York "in furtherance of the execution of business purpose in New York." *Id.* at 714–15.

■ In this case, Wilson came to New York to play hockey and, as a result, stayed in New York hotels and ate in New York restaurants. Wilson, however, did not have any control over the team's schedule and travel arrangements. The Court concludes that the defendants do not satisfy the doing business provision of the long arm statute. The Court declines to adopt the view that an athlete playing on a team is doing business, for personal jurisdiction purposes, in every state where his team plays.

## B. Section 302(a): Transacting Business in New York

The Court must also consider whether the defendants transacted business in New York and whether the instant lawsuit arises out of that transaction. If the plaintiff can establish these facts, the defendant would be amenable to suit under CPLR § 302(a)(1). The standard for transacting business is somewhat more liberal than the test for doing business. Judge Weinstein has vividly described the difference in standards by noting, "[d]oing business is to transacting business what a full length mink coat is to tennis shorts." *Bulova Watch Co. v. K. Hattori & Co.*, 508 F.Supp. 1322, 1345 (E.D.N.Y.1981). To apply Judge Weinstein's analogy to this case, the defendants, for jurisdictional purposes, are wearing something less than tennis shorts.

■ Although there is no definitive test for jurisdiction under § 302(a)(1), the primary factors to be considered include the defendant's physical presence in New York, the extent of negotiations in New York and the contract's performance in New York. *See Berk*, 646 F.Supp. at 1084. In considering a defendant's visits to the state, a court must examine the specific facts of the visit. *Id.* The central question in the analysis in whether the defendant has performed purposeful acts in New York in relation to the contract.

■ In this case, the plaintiff has failed to make a prima facie case for jurisdiction under § 302(a)(1). The defendant hardly directed his activities purposefully at this jurisdiction regarding the 1982 agency agreement. The defendant's purposefully directed activities in New York were to aid the defense of the Chicago Blackhawks.** His contacts with Kaminsky were either in locker rooms or restaurants. While part of their conversations presumably concerned their business arrangements, the affidavits indicate that the meetings were initiated by Kaminsky. It would be fundamentally unfair to transform these contacts into the basis for an assertion of personal jurisdiction. Although Kaminsky lists certain topics allegedly discussed at these meetings with Wilson, these matters are subjects that preceded the October, 1982 contract. For example, Kaminsky points to the establishment of an account on Wilson's behalf with Fidelity Source Securities Brokerage House. This account, however, was opened in February, 1982, months before the contract was signed. While Kaminsky and Wilson may have discussed the preparation of a last will and testament, the wills were prepared by the summer of 1982. In addition, any discussions concerning the retention of New York counsel occurred well before October, 1982 because the New York attorney was representing Wilson by January, 1982. Kaminsky is further unable to specify what commercial endorsement opportunities actually developed for Wilson as a result of the alleged discussions in New York.

The fact that these discussions do not arise out of the 1982 agreement is under-

---

** The Court, having seen the defendant Wilson play against the New York Rangers, notes that he is also a very capable offensive player. This, however, is a trait seemingly shared by all those who have played against the Rangers, at least during this past season.

scored by an examination of that document. It states that RDS and ACK negotiated Wilson's contract with the Blackhawks, and that they would provide him with additional services. These additional services were to be rendered prospectively. Therefore, discussions that occurred before October, 1982 concerning similar services do not relate to the contract and are insufficient for section 302(a)(1). *See Mattgo Enterprises, Inc. v. Aaron*, 374 F.Supp. 20, 23 (S.D.N.Y. 1974).

This case is far from the situation where a one day visit to New York involved the full negotiation and execution of a contract. In that case, the New York Court of Appeals held the transacting business standard was met. *See George H. Reiner & Co. v. Schwartz*, 41 N.Y.2d 648, 394 N.Y. S.2d 844, 363 N.E.2d 551 (1977). For the reasons mentioned previously, this case is distinguishable from *Cranston Print Works Co. v. Brockmann International A.G.*, 521 F.Supp. 609, 611–12 (S.D.N.Y. 1981), where a prima facie case of jurisdiction was established when the plaintiff set forth specific dates and meetings, and how these meetings related to the contract in dispute.

Finally, it should be stressed that when Wilson was playing for the Blackhawks in New York, he was performing under his contract with the Blackhawks, and not the 1982 agency agreement. These two contracts are entirely separate and the performance under one contract may not be the jurisdictional predicate under CPLR § 302(a)(1) for a cause of action under the other contract.

## CONCLUSION

For the reasons set forth above, the defendants' motion to dismiss for lack of personal jurisdiction is granted.

The complaint is hereby dismissed in its entirety.

SO ORDERED.