**DON KING PRODUCTIONS, INC. Plaintiff,**

**Trump Plaza Associates, Plaintiff/Intervenor,**

v.

**James "Buster" DOUGLAS, John P. Johnson, Golden Nugget, Inc., and The Mirage Casino–Hotel, Defendants.**

**Nos. 90 Civ. 1203 (RWS), 90 Civ. 1423 (RWS).**

United States District Court, S.D. New York.

April 4, 1990.

Sidley & Austin, P.C., New York City, for plaintiff; Steven M. Bierman, of counsel.

Parcher & Hayes, New York City, for plaintiff/intervenor; Steven M. Hayes, of counsel.

Clapp & Eisenberg, Newark, N.J., for plaintiff/intervenor.

Warshaw Burstein Cohen Schlesinger & Kuh, New York City, for defendants; Robert Fryd, Debra J. Guzov, of counsel.

## OPINION

SWEET, District Judge.

Defendants James "Buster" Douglas, John P. Johnson, Golden Nugget, Inc. and The Mirage Casino–Hotel ("Mirage") move to dismiss on jurisdictional grounds, or alternatively, to transfer to the United States District Court for the District of Nevada the complaints brought against them in these consolidated actions by Don King Productions, Inc. ("DKP") and Trump Plaza Associates ("TPA"). For the reasons set forth below, the motion to dismiss is denied except as to the claims brought by TPA, as to which it is granted, and the motion to transfer is denied.

### The Parties

Defendant Douglas, a professional boxer who resides in the State of Ohio, is the heavyweight champion of the world. Douglas's boxing career is managed by Johnson, who is also an Ohio resident. The Mirage and its parent corporation, the Golden Nugget, are Nevada corporations, the former a licensed gaming casino-hotel located in Las Vegas.

DKP, a New York corporation, engages in the promotion of professional boxing bouts. DKP, which is headed by Don King, assertedly has the rights to promote Douglas's fights pursuant to certain agreements. TPA is a New Jersey partnership, the principal general partner of which is Donald Trump, a resident of New York. TPA owns and operates the Trump Plaza Hotel and Casino in Atlantic City.

### The Facts

On February 10, 1990, Douglas fought a title bout in Tokyo, Japan against then-heavyweight champion Michael Tyson which culminated in a tenth round knock-out of Tyson. That fight was promoted by DKP, pursuant to a promotion agreement and a bout agreement between DKP and Douglas which allegedly gives DKP the exclusive right and option to promote boxing fights of Douglas.[1] DKP also is the promoter of Michael Tyson.

Immediately after the bout, Don King, the president, chief executive officer and principal shareholder of DKP, questioned Douglas' victory (on grounds that an eighth-round knock-down of Douglas might have ended the fight had it not been for a long count), and allegedly sought to have the decision in favor of Douglas invalidated by the World Boxing Association and World Boxing Council. King's efforts failed. Although not without initial hesitation, Douglas eventually was recognized by all three international boxing federations as the winner of the bout and, therefore, as the reigning heavyweight champion of the world.

Prior to the February 10 title fight (and apparently anticipating a different fight outcome), DKP had agreed with TPA to hold a match between Tyson and Evander Holyfield on June 18, 1990 in Atlantic City, New Jersey, at the Trump Plaza. After Douglas defeated Tyson, DKP and TPA at some point agreed instead to use that date for a rematch between Douglas and Tyson at Trump Plaza. According to King and Trump, the agreement (the "Trump–King deal") was reached on or around February 12, 1990, although Trump's original announcement of the deal on that date was at that time questioned by his own spokespersons and, more significantly, publicly chal-

---

1. The promotion agreement was entered into on December 31, 1988 and the bout agreement was entered into on August 14, 1989.

lenged by King. DKP purportedly had the authority to enter into such an agreement contemplating Douglas' services, by virtue of DKP's exclusive promotional agreements with Douglas.

For several alleged reasons, including DKP's efforts to reverse the decision in favor of Douglas immediately following the February 10 bout, Douglas and his manager Johnson at some point after the Tokyo fight came to the view that they were no longer bound by the exclusivity provision of the promotional contracts with DKP. Douglas and Johnson commenced negotiations with various parties to find someone other than DKP to promote Douglas' next fight. On February 21, 1990, Douglas and Johnson signed a contract with the Mirage (the Douglas–Mirage contract), pursuant to which the Mirage would promote two fights of Douglas at the site of its hotel-casino in Las Vegas, Nevada. An express condition to Mirage's obligations under the agreement was the obtaining by Douglas and Johnson of a release or waiver from DKP of its purported exclusive promotional rights over Douglas or a final judgment from a Nevada state court or a federal court confirming that the exclusivity provision was void and unenforceable.

On February 21, 1990, Douglas, Johnson and the Mirage filed suit in Nevada state court, seeking a judicial declaration that the contracts between DKP and Douglas/Johnson were void in their entirety or alternatively without force with respect to the exclusivity clause. Grounds for invalidation included that King had breached duties he owed to Douglas under the contracts and that a regulation of the Nevada State Athletic Commission prohibited exclusive contracts between a boxer and promoter.

On February 22, 1990, DKP filed its complaint in this action, alleging that Douglas and Johnson had breached their contractual relations with DKP and that the Mirage had tortiously interfered with those rela-

tions. TPA commenced an action on March 2, 1990 alleging tortious interference by Douglas, Johnson and the Mirage with the Trump–King deal and sought by order to show cause to intervene in and to consolidate its action with the suit filed by DKP. That motion was granted on March 9, 1990.

Shortly after filing, the action commenced by Douglas, Johnson and the Mirage in Nevada state court was removed to the federal district court in Nevada. The federal court there recently denied a motion to remand the case to state court and has scheduled the case for a hearing on April 9, 1990. This court has been advised that a motion to transfer that action to this district is in the process of being filed or has been filed.

### The Issues

### Personal Jurisdiction over Douglas and Johnson

Defendants Douglas and Johnson urge dismissal of both the DKP and TPA actions on grounds that the court lacks *in personam* jurisdiction over them.[2] Although a plaintiff has the ultimate burden of establishing jurisdiction over a defendant by a preponderance of the evidence, prior to an evidentiary hearing the plaintiff "need make only a *prima facie* showing by its pleadings and affidavits that jurisdiction exists." *CutCo Industries v. Naughton,* 806 F.2d 361, 365 (2nd Cir.1986) (citations omitted). For the reasons set forth below, DKP has made such a showing with respect to defendants Douglas and Johnson, and TPA has not.

### A. The DKP Breach of Contract Claims

■ DKP has sued Douglas and Johnson for breach of the promotion and bout agreements. DKP asserts this court has personal jurisdiction over Douglas and Johnson with respect to this claim pursuant to the "transaction of business" provision of the New York long-arm statute, CPLR

---

**2.** Johnson also moves to dismiss for insufficiency of process. That portion of the motion is not yet ripe for adjudication. *See* Fed.R.Civ.P. 4(j) (providing for 120 day period in which to serve summons and complaint). The request may be reviewed at the time of the scheduled hearing on the preliminary injunction motion.

§ 302(a)(1).[3] This section provides that a court may exercise personal jurisdiction over a nondomiciliary who in person or through an agent "transacts any business within the state," *id.*, provided there is "some articulable nexus between the business transacted and the cause of action sued upon." *Beacon Enterprises, Inc. v. Menzies,* 715 F.2d 757, 762 (2nd Cir.1983). In determining whether the standard of § 302(a)(1) is satisfied in a breach of contract case, the court considers the totality of the defendant's contacts with New York, *Citicorp International Trading Co., Inc. v. Western Oil & Refining Co., Inc.,* 708 F.Supp. 86, 88 (S.D.N.Y.1989), asking "the central question ... whether the defendant has performed purposeful acts in New York in relation to the contract." *A.C.K. Sports v. Doug Wilson Enterprises,* 661 F.Supp. 386, 389 (S.D.N.Y.1987). *See also CutCo Industries, Inc. v. Naughton,* 806 F.2d 361, 365 (2nd Cir.1986).

DKP has made a *prima facie* showing that Johnson and Douglas performed purposeful acts in New York in relation to the contract sufficient to satisfy the test of § 302(a)(1). Without question the principal performance required of Douglas by the contracts—fighting—did not take place in New York, Douglas and Johnson did not execute the agreements in New York, and the acts constituting the alleged breaching conduct also appear to have taken place outside the state. Nevertheless, in other respects Johnson and Douglas conducted activity in New York pursuant to the contracts so as to avail themselves of New York laws.

Included among their alleged New York transactions relating to their contracts with DKP were: (*a*) New York appearances by Douglas pursuant to the publicity provision of the promotional agreement to promote the two boxing events DKP had scheduled for Douglas under the Agreement (these consisted principally of a 1989 press conference in New York, arranged by DKP to promote the bout between Douglas and Oliver McCall, held in Atlantic City on July 21, 1989 as a warm-up to the Tyson/Williams fight on the same card, and the taping of an interview of Douglas and Tyson on HBO to be used in connection with HBO's delayed broadcast of the Tokyo bout); (*b*) two meetings in New York with Don King at which were discussed possible bouts for Douglas under the agreements (one such meeting occurred in 1989 before the fight with McCall, at which King discussed with Douglas a possible future bout between Douglas and Tyson; the other meeting, between King and Johnson, occurred after the Tokyo bout, on February 14 or 15, 1990, when King alleges he discussed future fight arrangements including a rematch of Douglas and Tyson under the contracts); (*c*) telephone and mail contact by Johnson and his lawyer, in Ohio, with King and DKP's counsel in New York in connection with the negotiation of the promotional agreement, which according to King were contacts initiated by Johnson; and (*d*) the inclusion in the final promotional agreement of a New York choice of law provision.

"Acts performed by a defendant subsequent to the execution of a contract are ordinarily of jurisdictional consequence." *CutCo Industries v. Naughton,* 806 F.2d 361, 367 (2nd Cir.1986). Here, Douglas and Johnson did direct certain activities purposefully toward this jurisdiction in connection with Douglas' fighting contracts after they were executed, coming here twice to assist in the promotion of fights that had been arranged by DKP under the contracts, and, on those occasions, discussing with DKP possible future fights contemplated by contract. They also to some degree initiated New York contacts in negotiating the promotional agreement, although these "long-range communications" did not constitute "extensive purposive activity here without actually setting foot in the State." *CT Chemical (U.S.A.), Inc. v. Horizons International, Inc.,* 106 F.R.D. 518, 520 (S.D.N.Y.1985), *citing Parke–Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13,

---

**3.** A federal court looks to the jurisdictional statutes of the forum state when determining personal jurisdiction over a defendant in a diversity action. *Savin v. Ranier,* 898 F.2d 304, 305–06 (2nd Cir.1990); *Beacon Enterprises, Inc. v. Menzies,* 715 F.2d 757, 762 (2nd Cir.1983).

17, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970).

Were these acts, in isolation, all DKP could show by way of New York contacts, the court might be hesitant to exercise *in personam* jurisdiction over these defendants. However, in addition to this glancing physical presence of the defendants in New York for purposes of transacting business under the agreements, there is also the fully contemplated performance by DKP in New York of duties under the contract for the benefit of the defendants. "A defendant may be found to have engaged in a purposeful transaction when the contract calls for the plaintiff to perform activities in New York for the benefit of the defendant." *Wichita Federal Savings and Loan Assn. v. Comark*, 586 F.Supp. 940, 944 (S.D.N.Y.1984), *aff'd*, 810 F.2d 1161 (2nd Cir.1986); *see also Schneider v. J and C Carpet Co., Inc.*, 23 A.D.2d 103, 258 N.Y.S.2d 717, 719 (1st Dep't 1965).

At the time these agreements were entered into, it was no secret to Douglas and Johnson that DKP was an enterprise principally based in New York and could be expected to perform the bulk of its promotional activities here, governed by New York law. *Cf., A.C.K. Sports, Inc. v. Doug Wilson Enterprises*, 661 F.Supp. 386, 388 (New York forum unavailable where, *inter alia*, heart of New York agent's duties pursuant to contract with defendant hockey player was to conduct negotiations in Illinois with team based there). DKP as expected has performed the heart of its promotional obligations owed to Douglas, *viz.*, negotiating, arranging and contracting for bouts with Douglas' opponents, from its New York offices. The negotiations for the fight with Tyson took place in New York as did the contractual arrangements for the site in Tokyo, and those with the Japanese fight promoter. New York is also said to have been the center for the majority of arrangements made in connection with the other bouts DKP has set up for Douglas under the contract, and Douglas' purses and training expenses are paid by checks from DKP issued out of New York. Consistent with this contemplated New York activity, New York law was selected to govern the contract in the choice of law clause set forth in the promotional agreement. *See Burger King v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (choice of law provision is a factor to consider when making jurisdictional determinations).

Viewing these jurisdictional facts in totality, DKP has established a *prima facie* case that Douglas and Johnson transacted business within New York in relation to the contract in dispute within the meaning of CPLR § 302(a)(1). Through all of the above actions, they "purposefully avail[ed] [themselves] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *CutCo Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2nd Cir.1986), *quoting McKee Electric Co. v. Rauland–Borg Corp.*, 20 N.Y.2d 377, 382, 283 N.Y.S.2d 34, 229 N.E.2d 604 (1967).

### B. The TPA Tortious Interference Action

TPA's claim against non-domiciliaries Douglas and Johnson stands on different and more infirm jurisdictional grounds. That action, for tortious interference of a contract alleged to exist between TPA and DKP, sounds in tort. TPA has no contract with Douglas or Johnson and may not therefore achieve jurisdiction over these non-domiciliary defendants on the basis of DKP's showing that Douglas and Johnson transacted business in New York in connection with contracts they had with DKP. Under § 302(a)(1), which TPA relies upon, it is TPA's burden to show that the alleged tortious interference with the Trump–King contract arose out of business transacted by Douglas and Johnson in New York, or at least that such interference is closely related to their New York business activities to a degree satisfying § 302(a)(1). *Hermann v. Sharon Hospital, Inc.*, 135 A.D.2d 682, 522 N.Y.S.2d 581 (2d Dept. 1987) (for purposes of *in personam* jurisdiction under § 302(a)(1), tort must arise from defendant's business conduct in New York); *Talbot v. Johnson Newspaper Corp.*, 123 A.D.2d 147, 511 N.Y.S.2d 152

(3d Dept.1987) ("substantial relationship" must exist between alleged business activity in New York and tort claim under long-arm provision § 302(a)(1)), *aff'd,* 71 N.Y.2d 827, 527 N.Y.S.2d 729, 522 N.E.2d 1027 (1988); *see also Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988); *McGowan v. Smith,* 52 N.Y.2d 268, 271–272, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981).

■ Under that standard, the asserted contacts are too frail to support jurisdiction here.[4] TPA's complaint alleges that agents of the Mirage Hotel, a Nevada corporation, sometime after February 12, 1990 induced Douglas and Johnson to interfere with the Trump–King deal by offering Douglas and Johnson $25 million dollars to fight Holyfield at the Mirage in Las Vegas in September 1990, and that Douglas and Johnson thereafter publicly announced they had agreed with Mirage that Douglas' next bout would take place at that time and place. The TPA complaint does not allege that any of that conduct occurred in New York and TPA does not challenge affidavits (and deposition testimony) showing that the Douglas–Mirage contract—the essential piece of business alleged to constitute the tortious interference—was negotiated and executed in Nevada and Ohio, not New York. TPA also fails to make a prima facie case that Douglas or Johnson had any substantial contacts with the Mirage while in New York, or that the public statements attributed to Douglas and Johnson in the complaint concerning the repudiation of the Trump–King contract were made in New York.

Instead, TPA relies on the fact that Douglas, in New York, participated in a press conference, filmed an HBO program, appeared on the David Letterman show, and held an interview with Sports Illustrated—none of which are activities closely related to its cause of action for tortious interference—and, pushing slightly closer to the requisite nexus between New York conduct and the alleged tort, alleges that in New York, Johnson met with Bob Arum, a promoter in competition with King, to discuss Douglas' fighting future. Arum's hearsay deposition testimony does not, however, establish that the Mirage or its agents had any meetings with Johnson while he was in New York or that Johnson, while in New York, otherwise had any contact with Mirage or Wynn. In fact, the deposition does not establish that Johnson or Arum had any knowledge at this point

**4.** TPA has largely ignored the requirement that the New York conduct of the defendants bear a substantial relationship to the tort. Citing *George Reiner & Co., Inc. v. Schwartz,* 41 N.Y.2d 648, 394 N.Y.S.2d 844, 363 N.E.2d 551 (1977), a breach of contract case, TPA asserts that the fact that Douglas signed agreements with a New York corporation, DKP, envisioning an ongoing relationship is itself sufficient to establish the requisite relationship under the "transacting business" test. It is doubtful that Douglas' signing of an agreement outside of New York binding him to relations with a New York party, DKP, would by itself suffice to establish jurisdiction over Douglas under § 302(a)(1) for purposes of a breach of contract action brought by the other party to the contract, DKP. Whether or not that is so, execution of that contract with a New York party, DKP, in no way establishes that Douglas must submit to suit here in a separate tortious interference action, brought not by DKP but TPA, and predicated upon a wholly separate contract said to exist between DKP and TPA (which also is not alleged to have been made in New York), to which Douglas is not a party. For the same reason, TPA's attempt to rely on the choice of law provision contained in the promotion agreement between DKP and Douglas is unavailing. To be sure, choice of law clauses in a contract (although not equivalent to a consent to jurisdiction), may be considered in the jurisdictional analysis as reinforcing a contractual party's otherwise indicated "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 482, 105 S.Ct. 2174, 2187, 85 L.Ed.2d 528 (1985). The foreseeable litigation, in such an analysis, is with the other party to the contract and with respect to a breach of the contract that is governed by the choice of law clause. *See e.g., First City Federal Savings Bank v. Dennis,* 680 F.Supp. 579 (S.D.N.Y.1988) (New York choice of law provision in a note considered as one of several contacts supporting jurisdiction in action between parties to note). Here, TPA is not the other party to the promotion or bout agreement nor is its cause of action one for breach of that contract. TPA thus fails to explain how Douglas' contractual agreement with DKP to be governed by New York law in their relations supports an argument under § 302(a)(1) that Douglas, as a tortfeasor who impaired contract relations between TPA and DKP, engaged in business in New York interfering with the relations of TPA and DKP.

that any contract between King and TPA existed (although both were aware of Trump's publicly stated claim to a right to have the rematch held in Atlantic City).[5]

Apart from that meeting in New York with Bob Arum about his approaching negotiations with King on the terms of the rematch, TPA does not allege Johnson or Douglas transacted any business in New York that interfered with the Trump–King deal. TPA does allege that, according to Arum, Johnson, two days later while at home in Ohio, thought of using (but in fact did not use) Arum's New York office to make travel arrangements from Ohio to Las Vegas, where Johnson intended to discuss deals with a number of promoters in Las Vegas, including but not limited to Wynn. Instead, as it happened, Johnson met with an agent of Wynn's in Ohio, who convinced Johnson and Douglas to fly out to Las Vegas on the Mirage corporate jet. Johnson's telephone inquiry to Arum's New York office about the possibility of that office making travel arrangements, assuming it was in aid of Johnson's trip to Nevada during which he would interfere with the alleged Trump–King contract, is far too thin a reed upon which to predicate New York jurisdiction.

At best, these New York business activities are only incidentally related to the tortious conduct that is in question in the TPA lawsuit, which on this limited record appears to have transpired outside of New York. *Cf. Talbot v. Johnson Newspaper Corp.,* 123 A.D.2d 147, 511 N.Y.S.2d 152 (defendant may not be subject to personal jurisdiction in New York based on defamatory letters written in California "simply because her contact with New York was a link in the chain of events" giving rise to tortious conduct); *Hermann v. Sharon Hospital, Inc.,* 135 A.D.2d 682, 522 N.Y. S.2d 581 (no *in personam* New York jurisdiction over defendant, a Connecticut hospital, for malpractice claim arising from operation conducted in Connecticut, since tort did not arise from business transacted by the hospital in New York). As it cannot fairly be said that Douglas and Johnson purposefully availed themselves of the opportunity to conduct business in New York from which conduct the tort alleged by TPA arose, there is an inadequate basis for asserting jurisdiction under § 302(a)(1) over Douglas and Johnson in the TPA action.

■ The more ordinary provision of the New York Civil Rules of Practice and Procedure for extending jurisdiction over a nondomiciliary tortfeasor, where the tortious act occurred without the state, is § 302(a)(3). That section imposes as a first requirement that the tortious act cause injury to a person or property within New York state. *See Chemical Bank v. World Hockey Association,* 403 F.Supp. 1374, 1379 (S.D.N.Y.1975). TPA has not addressed, presumably because it cannot satisfy, this long-arm provision.

**5.** According to Arum's testimony: (1) Johnson spoke to Trump briefly in Tokyo on February 10 after the fight and made no commitment at that time to Trump to have a rematch in June in Atlantic City; (2) Johnson in fact had reservations about any fight at Trump Plaza in Atlantic City because Douglas did not like to fight there; (3) Johnson told Arum on February 14, when he and Douglas were in New York for the HBO promotion film, that Douglas was under a contract with King ("[h]e said, I have a contract with King, I don't like the man, but if he does right for me, we are going to fight for him"), that Johnson wished Douglas to fight a rematch with Tyson, that he was meeting with King that evening to discuss the rematch with Tyson, which, regardless of Trump's desires, he did not wish held in Atlantic City, and that he wanted Arum's advice on how much money he should ask King for in connection with the anticipated rematch.

Thus, the deposition does not support the proposition that Johnson and Douglas had been advised by King prior to this meeting in New York on February 14 that any commitment had been made by King to hold the rematch in Atlantic City at Trump Plaza, although newspaper reports of February 12, 1990 are clear that Trump already had made public claims that an agreement existed to host the rematch there, and that those claims had been publicly disputed by King. Also of note is Arum's statements about meetings held a few days later in Las Vegas, after Douglas and Johnson had flown there from Ohio with Steve Wynn on The Mirage's private jet: "... in New York [Johnson] was talking about driving the best bargain with King and that King would promote the fight. In the meeting I had with him [in Las Vegas], it was under no circumstances would King have anything to do with Douglas' fight."

TPA is a New Jersey partnership, and its principal place of business—the Trump Plaza Casino and Hotel—is Atlantic City, New Jersey. Thus, were one to assume that jurisdiction could be sustained by virtue of indirect economic injury to a plaintiff's place of business, such injury would be to a "person or property" within New Jersey, not New York.

■■■ Under New York law, in any event, for jurisdictional purposes the injury caused by a commercial tort does not occur within the state merely because New York was the place where the plaintiff is located and lost profits. 1 Weinstein, Korn & Miller, *New York Civil Practice* ¶ 302.14 at p. 3–142.23. Rather, the situs of injury is generally considered to be the place where " 'the critical events associated with the dispute took place.' " *Chemical Bank v. World Hockey Ass'n*, 403 F.Supp. at 1380 (holding § 302(a)(3) provided no jurisdiction over defendants accused of interfering with New York based-plaintiff's secured interest in hockey franchise, where the "crucial dealings"—the signing and negotiating of the allegedly interfering contract with a competing franchise—occurred in Maryland and the interfering contract called for athletic performances in New Jersey). *See also Smith v. Morris and Manning*, 647 F.Supp. 101, 104 (S.D.N.Y. 1986); *Mije Associates v. Halliburton Services et al.*, 552 F.Supp. 418, 420 (S.D.N.Y. 1982). Here, the crucial dealings—formation of the Douglas–Mirage contract that allegedly interferes with the Trump–King contract—occurred in Nevada and Ohio and the interfering contract calls for performance in Nevada. Thus, § 302(a)(3) affords TPA no basis for the exercise of jurisdiction here over Douglas and Johnson.

For these reasons, a prima facie case has not been made under New York law that this court possesses *in personam* jurisdiction over defendants Douglas and Johnson

in the tortious interference action brought by TPA. Accordingly, the action by TPA is dismissed as against those defendants.

*Venue of the TPA Action*

28 U.S.C. § 1391(a) provides that where jurisdiction is founded only on diversity of citizenship, an action can be commenced in the district where all plaintiffs or all defendants reside, or in which the claim arose. In determining where a claim arose, courts look to:

> where the contacts weigh most heavily ... ascertained by advertence to events having operative significance in the case, and a common sense appraisal of the implications of those events for accessibility to witnesses and records.

*Birnbaum v. Blum*, 546 F.Supp. 1363, 1366 (S.D.N.Y.1982) (quoting *Sharp Electronics Corp. v. Hayman Cash Register Co.*, 655 F.2d 1228, 1229 (D.C.Cir.1981); *see also Catsimatidis v. Innovative Travel Group, Inc.*, 650 F.Supp. 748, 752 (S.D.N.Y.1986).

■■■ In the case of the action brought by TPA, defendants correctly assert that venue does not exist in the Southern District of New York under the terms of the statute. The TPA complaint predicates venue on the allegation that its claim of tortious interference arose in this district.[6] For the reasons noted in the jurisdictional discussion above, that allegation has not been sustained. None of the events having chief operative significance to TPA's cause of action—the formation of the contract between TPA and DKP to hold a fight in Atlantic City, the formation of the allegedly interfering Douglas–Mirage contract, and the fight called for by that contract in Las Vegas—relate to the Southern District of New York. The alleged interference occurred in Nevada and in Ohio (where Douglas and Johnson reside), the fight interfered with is scheduled to occur in New Jersey, and New Jersey is where the plain-

---

**6.** The complaint also alleges venue is proper because Donald Trump, the principal general partner of TPA, resides in the district. This claim ignores substantial authority that "for purposes of determining venue, the 'residence' of a limited partnership ... is the partnership's principal place of business" and that the "domi-

cile or residence of the individuals who make up the partnership is irrelevant for venue purposes, because of the partnership's business nature, similar to that of a corporation." *FSI Group v. First Federal Savings and Loan Association*, 502 F.Supp. 356, 357 (S.D.N.Y.1980) (citing cases).

tiff principally engages in business. There is no apparent basis for TPA's claim that its (as opposed to DKP's) action arose in this district, and venue is therefore not properly found here.

■ TPA does not defend the Southern District as a proper venue under the terms of 28 U.S.C. § 1391(a). Instead, it urges that it need not bother to establish an independent basis for venue since it has been found to be an intervenor as of right in the DKP lawsuit. *See* 3B *Moore's Federal Practice,* ¶ 24.19 (1987):

> where intervention is as of right, no objection on venue grounds lie.... [W]here intervention is not of right, ... an intervening plaintiff should be required to meet the venue requirements; if objection to this ground could have been made had the intervenor been joined originally as a plaintiff, the objection should be equally valid as against him as an intervener.

However, the venue objection is here valid as against TPA as intervener. TPA's application for intervention by order to show cause stated only that it sought intervention under Rule 24, Fed.R.Civ.P. In its brief, it requested intervention under Rule 24(a) as a matter of right, or, alternatively, permissive intervention that is available under Rule 24(b), where a party's claims and the main action "have a common question of law or fact in common." At the March 9, 1990 hearing at which the court granted TPA's request for intervention, no clarification was sought of the form of intervention in question, and the court indicated to the parties that its order did not dispose of, and was without prejudice to the defendants' future litigation of, challenges to the presence of the actions in New York predicated on jurisdictional or related grounds. Defendants have now posed such a challenge. TPA's reliance on the unspecified intervenor status it secured on March 9, 1990 therefore does not displace its obligation to establish that venue properly lies in the Southern District of New York. For the noted reasons, venue does not. Accordingly, TPA's claims are dismissed, no applica-

tion having been made for transfer of those claims to an appropriate venue.

*The Prior Pending Action Rule*

■ Defendants also move to dismiss the DKP action in New York on the ground that the defendants' Nevada suit was the first filed. The "prior pending action" rule followed in this Circuit provides generally "where there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience ... or ... special circumstances ... giving priority to the second." *First City Nat. Bank and Trust Co. v. Simmons,* 878 F.2d 76, 79 (2nd Cir.1989) (quoting prior Circuit decisions). However, "the practice of determining priorities between pending actions on the basis of dates of filing is a general rule, not to be applied in a mechanical way, regardless of other considerations." *Brierwood Shoe Corp. v. Sears, Roebuck & Co.,* 479 F.Supp. 563, 568 (S.D.N.Y.1979), *citing Hammett v. Warner Bros. Pictures, Inc.,* 176 F.2d 145, 150 (2nd Cir.1949); *see also Columbia Pictures Industries Inc. v. Schneider,* 435 F.Supp. 742, 747 (S.D.N.Y.1977), *aff'd,* 573 F.2d 1288 (2nd Cir.1978).

Considerations that have been found to render the rule inapplicable include those situations in which priority of filing was gained by winning a "race to the courthouse," as is frequently the case when the first-filed suit is a declaratory judgment action filed in anticipation of the later-filed action. *See, e.g., Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 219 (2nd Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979); *Hartford Accident & Indem. Co. v. Hop–On Intl. Corp.,* 568 F.Supp. 1569, 1573 (S.D.N.Y.1983); *Dow Jones & Co., Inc. v. Board of Trade,* 539 F.Supp. 190, 193 (S.D.N.Y.1982); *Brierwood,* 479 F.Supp. at 568; *Columbia Pictures,* 435 F.Supp. at 745–48. Courts also pay little regard to the date of filing when the competing suits were commenced within days of each other. *See, e.g., Factors,* 579 F.2d at 217 (5 days); *Columbia Pictures,* 435 F.Supp. at 744 (6 days); *Brierwood,* 479 F.Supp. at 568 (2 days).

In this instance, the Nevada complaint for declaratory relief was filed at 4:58 p.m. as the state court there closed on February 21; DKP filed its complaint in the Southern District of New York the next morning. A few days prior to the commencement of the Nevada suit by the Mirage, Douglas and Johnson, DKP's attorney had alerted Wynn to the prospect of litigation after hearing that discussions might be under way between the Mirage and Douglas. DKP's notice letter of February 16 stated that DKP had an exclusive promotional agreement with Douglas, that it would not tolerate interference with the agreement, and that it would take necessary steps to protect its rights. The day prior to the commencement of the Nevada suit, King met with Wynn in Las Vegas for the purpose of discussing their differences but no resolution was reached. At that meeting, Wynn made certain proposals to King, which King apparently rejected, and to which Wynn then asked King to give further consideration. King indicated he would do so, and would respond the next day, February 21. The Nevada law suit seeking a declaration of Douglas' rights under his contract with DKP was filed late in the afternoon on that next day without further communication from Wynn to King.

One need not express disapprobation of the tactics employed by the Nevada plaintiffs to conclude that their conduct also is not deserving of reward. Application of the "first to file" rule would upon the recited facts serve no salutary purpose. As the court stated in *Columbia Pictures*, to credit the results of such races to the courthouse:

> would create disincentives to responsible litigation.... Potential plaintiffs should be encouraged to attempt settlement discussions (in good faith and with dispatch) prior to filing lawsuits without fear that the defendant will be permitted to take advantage of the opportunity to institute litigation in a district of its own choosing before plaintiff files an already drafted complaint.

*Columbia Pictures*, 435 F.Supp. at 747–48. *See also Brierwood*, 479 F.Supp. at 568 (two day loss of race to courthouse by party attempting to resolve dispute short of litigation of no significance in determining appropriate forum); *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.*, 267 F.Supp. 938, 941–42 (S.D.N.Y.1967) (plaintiff in declaratory judgment action who "outraced" defendant to courthouse following settlement conference entitled to no priority of forum). Accordingly, in considering the proper forum for this dispute, no weight shall be assigned to the fact that the Mirage, Douglas and Johnson managed to institute suit court minutes prior to DKP.

*Transfer Considerations under 28 U.S.C. § 1404(a)*

Failing to gain relief under the "first to file" rule, in the alternative, defendants seek to have this action transferred to Nevada. A change of venue is governed by 28 U.S.C. § 1404(a), which states:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

The moving party must make a clear showing to justify a change of venue. *See Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2nd Cir.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979); *Citicorp*, 708 F.Supp. 86, 89 (S.D.N.Y.1989); *Troyer v. Karcagi*, 488 F.Supp. 1200, 1207 (S.D.N.Y.1980). Several considerations are relevant to the determination of whether that burden has been met, including the place where the operative facts occurred; the convenience of the parties; the convenience of the witnesses; the relative ease of access to the sources of proof and the availability of process to compel attendance of unwilling witnesses; the plaintiff's choice of forum; a forum's familiarity with the governing law; trial efficiency; and the interests of justice. *See, e.g., Equipos Nucleares v. Fairfield Energy Venture, L.P.*, 1989 WL 6628, 1989 U.S. Dist. LEXIS 556 (S.D.N.Y. Jan. 23, 1989); *Rackman v. Texas Instruments, Inc.*, 712 F.Supp. 448, 450 (S.D.N.Y.1989); *Town of Warwick v. New Jersey Dep't of Environ-*

*mental Protection,* 647 F.Supp. 1322, 1323 (S.D.N.Y.1986). Balancing of these considerations "is left to the sound discretion of the district court." *Filmline (Cross-Country) Productions, Inc. v. United Artists Corporation,* 865 F.2d 513, 520 (2nd Cir.1989); *see also Stewart Organization, Inc. v. Ricoh Corp.,* 487 U.S. 22, 108 S.Ct. 2239, 2244, 101 L.Ed.2d 22 (1988) (§ 1404(a) requires district court to make discretionary determination calling for individualized, case-by-case consideration).

■■■ As discussed below, upon weighing the considerations presented, the defendants have not met their burden of clearly showing that transfer of this action to the District of Nevada is warranted.

### A. Location of Relevant Events and Convenience to Parties

■■■ As noted, the plaintiff DKP is a New York corporation with its principal place of business in New York City. The Mirage, and its parent Golden Nugget, are corporate residents of Nevada and Las Vegas is the center of their businesses. The remaining parties—Douglas and Johnson—are residents of Ohio who have travelled on business to both Nevada and New York in the past. Although DKP apparently does business in Nevada in connection with the promotion of fights there, it is alleged as well that the Mirage and Golden Nugget do business in this district from an office in New York City. Thus, convenience of the parties, all of whom are highly mobile and engage in business at more than a single location, does not tilt the scales decidedly toward or away from either one of the proposed fora.

The same is true of the "operative facts" consideration. Both the breach of contract and tortious interference claims of DKP rest initially upon construction of the agreements negotiated by DKP and Douglas/Johnson (or their lawyers), negotiations which took place principally in Ohio and New York, and not in Nevada. The events alleged to constitute the defendants' breach/interference with the contracts occurred principally in Nevada and Ohio, not New York. Finally, certain of the defendants' defenses are based upon the contention that DKP breached the contract first, implicating King's conduct in New York, in Tokyo and perhaps elsewhere. The "relevant events" factor therefore no more supports proceedings in Nevada than New York (or Ohio, for that matter, although no party has requested transfer of these proceedings there).

### B. Convenience of Witnesses/Access to Process

■■■ Witness convenience here does not strongly favor a particular forum. A party moving under section 1404(a) based on the convenience of the witnesses is required in this circuit to "clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover." *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2nd Cir.1978), *quoted in Town of Warwick v. New Jersey Dept. of Environmental. Protection,* 647 F.Supp. 1322, 1324 (S.D.N.Y.1986). Defendants have specified only one key non-party witness, a representative from the Nevada State Athletic Commission, who would be offered to testify as to the Commission's rules and their application to DKP. Defendants note that such a representative, if unwilling to attend, might not be subject to compulsory process in this court as an official of the State of Nevada.

That showing is insufficient to justify transfer. Judicial notice may of course be taken of the Commission's rules, including the regulation that prohibits a contract between a promoter and boxer that is exclusive. *See* Rules and Regulations of the Nevada State Athletic Commission § 467.112(3). The question of the bearing of those rules on DKP's contracts with Douglas and Johnson (and, in particular, whether that Commission's rules invalidate any provision of those contracts) is in turn a question of law that must be resolved by the judiciary. Assuming that the testimony of a Commission representative would be relevant and admissible to that determination, there is no apparent reason why such testimony could not be received in New York, by means of deposition conve-

niently taken in Nevada if not as live witness testimony in this district.

As to other witnesses, defendants have not identified which they intend to call. Among the likely party or party-related witnesses, King lives in New York, Wynn in Las Vegas. Douglas and Johnson (and their business attorney Stephen Enz) are in Ohio and will have to travel West or East in any event. Among the non-party witnesses, Dominick Gentile is a resident of Las Vegas, and his deposition has been scheduled to take place there. Robert Arum, although identified by defendants as residing in Nevada, already has been deposed in the Southern District of New York, where he has an office. From the above it is apparent that no great convenience of witnesses will be served by transferring the proceedings to Reno, Nevada. Neither party has suggested that access to other sources of proof is an issue supporting transfer.

### C. Trial Efficiency and the Interests of Justice

Implications for trial efficiency have also not been addressed by the parties and appear not to be determinative. Both this court and the Nevada court have indicated their availability to proceed rapidly to hearing and decision of the disputes. The interests of justice are also not at issue. Whatever credence might be given to the testimony of Arum to the effect that Wynn advised him of his belief that a more favorable hearing might be obtained in a Nevada state court due to his acquaintance with the judges there, a litigant's conjecture as to potential judicial bias (favorable or otherwise) generally tells more about the speaker than the subject. There is no basis in this record to believe that impartial treatment is any less available in the tribunals of Nevada than it is in the courts of New York, whether they be courts of the state system or of the federal judiciary to which the Nevada state action already has been removed. *Cf. Breathless Associates v. Tipler*, 1990 WL 6578, 1990 U.S. Dist.

LEXIS 728 (S.D.N.Y.1990) (declining to assume that Alabama court is less able than federal court to adjudicate dispute competently or fairly). The interest of justice does not dictate a New York forum any more than it does a Nevada one.

### D. Choice of Forum and Familiarity with Governing Law

The fact that plaintiff DKP chose the Southern District as its forum is of little consequence here, since Douglas, Johnson and Mirage nearly simultaneously selected another forum, in Nevada, in which they choose to appear as plaintiffs and DKP as defendant. That action has been removed to the federal court in Nevada, and this court has been advised by the parties that a transfer motion has been, or will shortly be, filed in the District of Nevada. In view of these facts, according the ordinary preference to a plaintiff's chosen forum is of no aid in resolving these motions.

What is of consequence and assistance, however, is that the promotional agreement DKP sues under here, and which is also the subject of the declaratory action commenced by defendants in Nevada, contains a choice of law clause dictating that "This Agreement shall in all respects be governed, construed and enforced in accordance with the laws of the State of New York ..."

As the Supreme Court recognized in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), and reiterated only last month, *see Ferens v. John Deere Co.*, —— U.S. ——, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990) (quoting *Gulf Oil*), a diversity case should be tried in a "forum that is at home with the state law that must govern the case." Here, the parties to the promotion agreement—Douglas, Johnson, and DKP—have agreed that the state law of New York controls construction of the promotion agreement and there is reason to believe that choice should be given effect.[7] Thus, it appears that a

---

**7.** Under the choice of law principles of New York, *see, e.g. Woodling v. Garrett Corp.*, 813

F.2d 543, 551 (2nd Cir.1987) (New York courts accord deference to choice of law provisions),

New York forum is most appropriate for resolution of the contract issues in the action, since "presumably, courts in New York are more familiar with New York substantive law than are the courts in" the transferee forum. *Citicorp,* 708 F.Supp. at 90; *see also First Federal Savings Bank v. Tazzia,* 696 F.Supp. 904, 910 (S.D. N.Y.1988); *The Prudential Insurance Co. of America v. BMC Industries, Inc.,* 626 F.Supp. 652, 655 (S.D.N.Y.1985).

In a recent case reviewing a determination under 28 U.S.C. § 1404(a) denying transfer to a forum outside of New York, our Court of Appeals upheld the propriety of according weight "to the fact that the Agreement called for its construction and interpretation in accordance with New York law." *Filmline (Cross–Country) Productions v. United Artists Corp.,* 865 F.2d 513, 529 (2nd Cir.1989) (citing *Van Dusen v. Barrack,* 376 U.S. 612, 645, 84 S.Ct. 805, 823, 11 L.Ed.2d 945 (1964) for proposition that trial in state in which "federal judges are more familiar with the governing laws" is an appropriate factor to consider in determining change of venue motion). Several recent § 1404(a) motions of this court also have been determined with that factor weighing into the balance. *See e.g., Hopp v. Fox,* 1990 WL 34184, 1990 U.S. Dist. LEXIS 3018 (S.D.N.Y. March 20, 1990) (transfer granted to Mississippi court where, *inter alia,* "deed of sale under which the breach allegedly occurred states that Mississippi law will govern its interpretation"); *Equipos Nucleares, S.A. v. Fairfield Energy Venture, L.P.,* 1989 WL 6628, 1989 U.S. Dist. LEXIS 556 (S.D.N.Y. January 23, 1989) (action filed in Southern District transferred to Maine court where contracts in question "call for construction and interpretation in accordance with Maine law").[8]

In the absence of any clear showing by the defendants that transfer of this proceeding to Reno, Nevada would serve the convenience of the parties, witnesses or interests of justice, and in view of the agreement, by three of the central parties to this action, to have the contract underlying this action construed in accordance

---

and apparently Nevada, *see Ferdie Sievers and Lake Tahoe Land Co. v. Diversified Mortgage Inv.,* 95 Nev. 811, 603 P.2d 270, 273 (Nev.1979) (Nevada follows Restatement (Second) of Conflict of Laws), effect ordinarily is to be given to the law chosen by the contracting parties to govern their dealings. *See* Restatement (2d), Conflicts of Laws § 187(2) (1971 & 1985 Supp.) (choice of law provisions set forth in parties' contract are to be observed unless chosen state has no substantial relation to the parties' contractual dealings or application of chosen law is contrary to the "fundamental policy" of a state with a "materially greater interest" than chosen state in deciding the particular issue), *analyzed in S.E.C. v. Elmas Trading Corp.,* 683 F.Supp. 743, 749–752 (D.Nev.1987). In *Ferdie Sievers,* the Nevada court honored the parties' choice of Massachusetts law to govern a loan agreement, notwithstanding that Massachusetts law permitted a rate of interest that was usurious under Nevada law. The court noted:

The [usury] statute may not abrogate rights of parties contracting beyond that state's jurisdiction, having little or no relation to anything done or to be done within Nevada ... A crucial function of the choice-of-law rules is that their application should further harmonious relations between states and facilitate commercial intercourse between them.

*Id.,* 603 P.2d at 273–74. Here, assuming *arguendo* Nevada has a policy contrary to New York law respecting exclusivity provisions and assum-

ing that Nevada as opposed to New York choice of law rules are applicable, it is not clear on this record that Nevada has a "materially greater interest" than New York—the state whose law was chosen to resolve contractual questions between the parties and the state of residence of one of the contracting parties who has performed promotional business under the agreements there. None of the parties to the contracts underlying the dispute reside in Nevada and neither agreement was negotiated or executed there. The relevant conduct that has occurred in Nevada is the alleged breach and interference with those agreements, not their performance, which DKP asserts is called for in Atlantic City, New Jersey, not Las Vegas, Nevada.

**8.** When a transfer motion is granted, as in *Hopp* or *Equipos Nucleares,* under the Supreme Court's decisions in *Ferens v. John Deere Co.,* —— U.S. ——, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990) and *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), the established rule is that the transferee court must apply the choice of law rules that prevailed in the transferor court. Here, those rules are New York's. However, the application of that rule to the present scenario, involving actions in two different districts with the possibility of reciprocal transfer motions in each, presents problems of circularity perhaps not contemplated in the Supreme Court decisions.

with New York law, it is appropriate that this diversity action remain in this district. Accordingly, the motion for transfer pursuant to 28 U.S.C. § 1404(a) shall be denied. The motion may be renewed should additional facts arise bearing on the proper resolution of the motion.

*Conclusion*

The motion to dismiss the complaint brought by TPA is granted as against Douglas and Johnson on the grounds that the court lacks personal jurisdiction over them and as against the Mirage on grounds that venue is not proper in the Southern District of New York. The motion to dismiss the complaint brought by DKP is denied on all grounds asserted. The motion to transfer this action to the United States District Court for the District of Nevada is denied.

It is so ordered.