W.J. NOLAN & CO., INC., William Nolan
and Matthew Gershon, Petitioners,

v.

MIDWAY FEDERAL CREDIT
UNION, Respondent.

No. 95 Civ. 6695 (CBM).

United States District Court,
S.D. New York.

Jan. 31, 1996.

Hayward Richard Pressman by Hayward Richard Pressman, for Petitioners.

Odin, Feldman & Pittleman by F. Douglas Ross, Kleinberg, Kaplan, Wolff & Cohen by Laurie Goodwyn, for Respondent.

## *OPINION*

MOTLEY, District Judge.

### I. *Introduction*

On or about July of 1991, respondent Midway Federal Credit Union ("Midway") opened an account with petitioners W.J. Nolan & Co. ("W.J. Nolan"), a small New York bond brokerage firm, William Nolan, W.J. Nolan's president, and Matthew Gershon, a registered representative employed by W.J. Nolan. W.J. Nolan was essentially enlisted as an introducing broker, to perform a series of securities transactions for respondent. Prudential Securities Incorporated ("Prudential"), which is not a party to this action, acted as the clearing firm for these transactions. All respondent's orders were handled by petitioners, and all commissions and fees were charged by petitioners. All trades were cleared through Prudential.

In keeping with Prudential's policy, a Client Opening Account Agreement (the "Customer Agreement") was executed which provided that disputes arising between the parties would be arbitrated; however this agreement was on Prudential letterhead and signed only by respondent. A conflict then developed between respondent and petitioners regarding petitioners' purchase, on respondent's behalf, of higher yield United States Government securities that did not meet the National Credit Union Association's stress test.

As a result of this dispute, on June 22, 1995 respondent commenced an action against petitioners in the Loudoun County Circuit Court in Virginia. Respondent charged petitioners with breaching the Virginia Securities Act, breach of fiduciary duty, and constructive fraud, alleging that petitioners had traded unsuitable securities to respondent. Petitioners requested an extension until August 31, 1995 to answer in state court, which was agreed to by respondent.

On August 21, 1995, without filing an answer in state court or providing notice to respondent, petitioners sought an *ex parte* temporary restraining order in the Southern District of New York to (1) compel arbitration pursuant to The Federal Arbitration Act, 9 U.S.C. sec. 1, *et seq.* (the "FAA"), and

(2) stay the Virginia action pursuant to 28 U.S.C. sec. 2283. Following a brief telephonic hearing with petitioners and respondent, Judge Kaplan denied this motion because petitioners had failed to demonstrate irreparable harm.

■ On September 22, 1995, respondent filed its opposition to the petition and a cross motion to dismiss based upon the *Colorado River* doctrine and venue.[1] In the alternative, respondent requested a transfer of this petition to the Eastern District of Virginia.

The state action which predates the federal action remains pending. On or about the same time that petitioners filed their petition in this court, they also moved the Virginia court to stay the Virginia action. Petitioners did not, however, move the Loudoun County Circuit Court to compel arbitration. Then on October 19, 1995, before this court had decided petitioners' motion, the Loudoun County Circuit Court granted petitioners' motion to stay the Virginia action.

Accordingly, the Virginia action has been voluntarily stayed by the Loudoun County Circuit Court "until the issue of arbitrability has been determined by the federal court." Petitioners' motion to stay the Virginia action made in this court has thus been disposed of by the Virginia court's decision, and will not be addressed here. Petitioners' motion to compel arbitration and respondent's motion to dismiss or transfer this action, on the other hand, remain before this court for determination.

For the reasons set forth below, this court concludes that no exceptional circumstances warrant the surrender of this court's proper jurisdiction over this action, and grants the instant petition to compel arbitration.

## II.  *The Colorado River Doctrine*

■ Respondent has moved to dismiss this action under the so-called *Colorado River* doctrine. In *Colorado River*, the Supreme Court affirmed the district court's dismissal of a case adjudicating water rights where a duplicative suit was pending in state court. *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). The Court held that, in exceptional circumstances, a district court could dismiss an action if "considerations of wise judicial administration" warranted it. *Id.* at 817–818, 96 S.Ct. at 1246. Emphasizing the "virtually unflagging obligation" of the district courts to exercise the jurisdiction given them, the Court enumerated three factors for a federal court to consider in assessing the appropriateness of dismissal where concurrent jurisdiction exists: (1) the inconvenience of the federal forum, (2) the desirability of avoiding piecemeal litigation, and (3) the order in which jurisdiction was obtained by the concurrent forums. *Id.* at 818, 96 S.Ct. at 1246; *see also Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.,* 460 U.S. 1, 15–16, 103 S.Ct. 927, 936–937, 74 L.Ed.2d 765 (1983) (denying motion to stay petition to compel arbitration made pursuant to the *Colorado River* doctrine).

### a.  *Inconvenience of the Federal Forum*

In this case, the inconvenience of the federal forum is a relative matter. Petitioners are located in New York; respondent is not. Therefore the Southern District of New York is no more inconvenient for respondent than Loudoun County Virginia is for petitioners. Further, the documents, records and witnesses that possess information about the trade orders placed by petitioners, which are crucial to the underlying dispute, are in petitioners' possession in New York. For these reasons, this court cannot conclude that the inconvenience of the federal forum favors dismissal.

### b.  *Desirability of Avoiding Piecemeal Litigation*

Because the Loudoun County Circuit Court has voluntarily chosen to stay the action pending before it "until the issue of arbitrability is determined by the federal

---

1. Respondent never moved to dismiss this action on the ground of personal jurisdiction. Accordingly, respondent has waived personal jurisdiction as a defense to this petition. *See* Fed. R.Civ.P. 12(g) and (h)(1); *Gilmore v. Shearson/American Express Inc.,* 811 F.2d 108, 112 (2d Cir.1987); and *Arkwright Mut. Ins. Co. v. Scottsdale Ins. Co.,* 874 F.Supp. 601, 604 (S.D.N.Y. 1995).

court," the risk of piecemeal litigation does not really exist. In fact, this decision by the Virginia court virtually disposes of respondent's motion to dismiss pursuant to *Colorado River*. There is no danger that the state court will arrive at a decision on the merits while this court is ruling on the arbitrability of the dispute. Thus, the Virginia court's decision to arrest its proceedings has obviated the need to dismiss this petition in order to avoid piecemeal litigation.

### c. Order in which Jurisdiction was Obtained

As respondent notes, the Virginia action was instituted months before this court was petitioned to compel arbitration. There is even some question as to petitioners' good faith in this regard, given petitioners' *ex parte* application for a temporary restraining order in federal court after petitioners had requested and received respondent's acquiescence to an extension of their time to answer in state court.

Nonetheless it seems inappropriate to assign great weight to the order in which jurisdiction was obtained. Since petitioners are defendants in state court, and since petitioners argue that disputes between the parties are arbitrable, their petition for arbitration literally could not precede the original action. It is the nature of the beast that a petition to compel arbitration will always follow commencement of litigation by an opposing party. Obviously, before an action is filed, there is no dispute to arbitrate. Thus this court declines to penalize petitioners for obtaining jurisdiction in the Southern District of New York only after respondent filed suit in Loudoun County, Virginia. *See Cone Memorial Hosp.*, 460 U.S. at 21–22, 103 S.Ct. at 939–940 ("priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions.")

### d. Other Considerations

Consideration of the three factors explicitly set forth in *Colorado River* does not weigh in favor of dismissing the instant petition. Still, "[n]o one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required." 424 U.S. at 818. Upon careful review, and with due regard to a federal court's obligation to exercise jurisdiction, this court finds that two considerations in particular make dismissal unwise.

First, as discussed, is the Virginia court's decision to voluntarily stay the action. Continued exercise of jurisdiction by this court will not result in wasted time and effort by the Virginia court. In fact, it is more expedient, given the stay, to determine arbitrability in this court. This court has already received briefing and heard oral argument by both sides regarding the arbitrability of this dispute. The Virginia court has not. Petitioners may, of course, move the Virginia court to compel arbitration in accordance with the FAA, were this court to dismiss their petition.[2] But since this court is familiar with the issues already, it is a poor use of judicial resources to force petitioners to make this very motion again in Virginia.

Second, this court is unconvinced that this petition is in fact "duplicative" of the action pending in Loudoun County, as that term is used in *Colorado River*. In Virginia, a lawsuit is pending against petitioners and there has been no petition made to compel arbitration of that lawsuit. The discrete issue presented here, on the other hand, is whether or not to compel arbitration. The two actions do not threaten to reach contrary results on the same issue. Rather, the outcome of the instant petition determines whether the Virginia lawsuit need proceed at all.

**2.** *See* 9 U.S.C. sec. 3, which provides: "If any suit or proceeding be brought in any of the courts of the United States upon an issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."

For the reasons set forth above, and in the interest of facilitating "wise judicial administration" and the "conservation of judicial resources," this court finds that dismissal is not warranted under the *Colorado River* doctrine. 424 U.S. at 817, 96 S.Ct. at 1246.

### III. *Venue*

■ Respondent also argues that the instant petition to compel arbitration should be dismissed because venue does not lie in the Southern District of New York. In accordance with 28 U.S.C. sec. 1391(a), venue is proper in: "(1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ... or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought."

■ Petitioners first make the bizarre argument that 28 U.S.C. sec. 1391(a)(1) renders venue proper in New York because petitioners are "defendants" in the stayed Virginia action and petitioners reside in New York. Yet it is clear that respondent is "defendant" for purposes of determining venue in this action and respondent resides in Virginia. Because respondent does not reside in this district, as required by 28 U.S.C. sec. 1391(a)(1), this section does not furnish a basis for venue. 28 U.S.C. sec. 1391(a)(3) likewise does not apply, since petitioners could have brought this action in the Eastern District of Virginia, where respondent resides, but chose instead to bring it here. Consequently, only provision 28 U.S.C. sec. 1391(a)(2) offers petitioners a possible basis for venue in this district. Under this section, it must be determined whether or not "a substantial part of the events or omissions giving rise to the claim occurred" in the Southern District of New York.

■ The court disagrees with respondent's idea that venue is improper in New York because the underlying "claim" is the lawsuit in Virginia and the "event" giving rise to it must therefore be its physical filing in Virginia. Respondent wishes to analogize this

case to *Bates v. C & S Adjusters, Inc.*, in which receipt of a collection notice was interpreted as an event giving rise to a claim under the Fair Debt Collection Practices Act, for purposes of establishing venue. 980 F.2d 865 (2d Cir.1992). However *Bates* offers no guidance here. In *Bates*, the statute permitted a private cause of action, so that the "claim" truly arose under the Fair Debt Collection Practices Act, and receipt of the notice actually gave rise to the claim. *See id.* at 868.

In contrast, no independent cause of action is created by the FAA. The underlying "claim" is not the petition itself, but the substantive dispute to be litigated, or arbitrated, as the case may be. *See Pervel Industries, Inc. v. TM Wallcovering, Inc.*, 675 F.Supp. 867 (S.D.N.Y.), *aff'd*, 871 F.2d 7 (2d Cir.1989) (petition to compel arbitration is granted in New York, where respondent first sued petitioner in Tennessee but alleged breach occurred in New York, and obligations were to be partly performed in New York). It follows that the "events" giving rise to the claim in this case are the disputed securities transactions and not the filing of the lawsuit in Virginia. Thus it is necessary to consider where these transactions occurred.

■ Petitioners allege, and respondent has not disputed, that (1) the orders for these transactions were placed by respondent in New York, (2) petitioners entered these transactions in New York, (3) these transactions were cleared and settled in New York, and (4) the books and records relevant to these transactions are in New York. Both petitioners and Prudential are located in New York and performed their services for respondent in New York. It is, therefore, evident that a substantial part of the events allegedly constituting securities violations, or fraud, on the part of petitioners occurred here and that venue is proper in the Southern District of New York pursuant to 28 U.S.C. sec. 1391(a)(2).

### IV. *Forum Non Conveniens*

Respondent proposes, in the alternative, that this action be transferred to the Eastern

District of Virginia under 28 U.S.C. sec. 1404(a). This section provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

■ As a preliminary matter, this court has the power to transfer a petition to compel arbitration to another district court under the doctrine of forum non conveniens.[3] The question is whether it is in the interest of justice to grant transfer and the burden is on respondent to establish that it is. *Maria Victoria Naviera, S.A. v. Cementos Del Valle, S.A.*, 759 F.2d 1027, 1031 (2d Cir.1985), citing *Gulf Oil v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947).

In assessing whether to grant transfer, the determining factors are: (1) where the operative facts occurred, (2) convenience of the parties, (3) convenience of the witnesses, (4) ease of access to sources of proof, (5) availability of process to compel attendance of unwilling witnesses, (6) petitioners' choice of forum, (7) the forum's familiarity with governing law, and (8) trial efficiency and the interests of justice. *Viacom International, Inc. v. Melvin Simon Productions, Inc.*, 774 F.Supp. 858, 868 (S.D.N.Y.1991); *Don King Productions, Inc. v. Douglas*, 735 F.Supp. 522, 533 (S.D.N.Y.1990).

■ In support of its motion, respondent argues that it, its witnesses, and its records are located in Virginia. Respondent also points out that petitioners initiated this ill-fated business relationship with a "cold call" made to respondent in Virginia. However respondent's contentions are insufficient, on their own, to support a section 1404 transfer. Since petitioners, their witnesses, documents and records are located in New York, the inconvenience to the parties cuts both ways.

Moreover, because respondent is charging petitioners with breach of the Virginia Securities Act, breach of fiduciary duty, and constructive fraud, which claims are predicated upon petitioners performing trades for respondent in New York, it is clear that the "operative facts underlying the transaction" occurred in New York. *See id.* For instance, petitioners assert, and respondent does not dispute, that the trade orders were placed in New York, the trades were executed and settled in New York, and all records relating to these orders are kept in New York, at petitioners' place of business and at Prudential.

Considerations of judicial economy also militate in favor of deciding this petition in New York. Parties have already briefed and argued the instant petition to compel arbitration in New York. The arbitration agreement provides that New York law will govern the parties' dispute. It is more efficient to retain jurisdiction over an action that will ultimately be governed by New York law, than to transfer it to Virginia. For these reasons, the interest of justice would not be better served by transferring this petition. Respondent's request for transfer to the Eastern District of Virginia is accordingly denied, and we will proceed to a consideration of the petition to compel arbitration.

## V. *The Petition to Compel Arbitration*

■ Petitioners have moved to compel arbitration of the parties' dispute pursuant to the FAA. The FAA requires a federal or state court to compel arbitration whenever a litigated controversy is referable to arbitration under a contract involving commerce. *See* 9 U.S.C. sec. 2.[4] Federal courts are obligated to direct arbitration where a liberal reading of the arbitration agreement shows that (1) the parties agreed to arbitrate, and

---

3. This has been squarely held by the Second Circuit, in spite of the FAA's provision that: "The hearing and proceedings, under such [arbitration] agreement, shall be within the district in which the petition for an order directing such arbitration is filed." 9 U.S.C. sec. 4. *See Maria Victoria Naviera, S.A. v. Cementos Del Valle, S.A.*, 759 F.2d 1027, 1031 (2d Cir.1985) (rejecting notion that the FAA precludes transfer of petition to compel arbitration on the basis of forum non conveniens).

4. This section provides, in relevant part: "A written provision in any ... contract evidencing a transaction involving commerce to settle by Arbitration a controversy thereafter arising out of such contract ... or an agreement in writing to submit to Arbitration an existing controversy arising out of such a contract ... shall be valid, irrevocable, and enforceable."

(2) the dispute is covered by the scope of the agreement. *See* 9 U.S.C. sec. 3.

Federal law governs the current dispute as to the scope of the Customer Agreement. *Cone Memorial Hosp.,* 460 U.S. at 24, 103 S.Ct. at 941 (FAA creates a "body of substantive law of arbitrability applicable to any arbitration agreement within the coverage of the Act.") Where the dispute concerns an issue of contract, the application of federal law "simply 'comprises generally accepted principles of contract law.' " *McPheeters v. McGinn, Smith and Co., Inc.,* 953 F.2d 771, 772 (2d Cir.1992) (citations omitted).

■■■■■■■ In passing the FAA, Congress sought to "revers[e] centuries of judicial hostility to arbitration agreements ... [and] place arbitration agreements 'upon the same footing as other contracts.' " *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 510–11, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974) (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess. 1, 2 (1924)); *see also Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 225–26, 107 S.Ct. 2332, 2336–37, 96 L.Ed.2d 185 (1987). There indisputedly exists a liberal federal policy favoring arbitration which has consistently been endorsed by the Supreme Court. *See McMahon,* 482 U.S. at 226, 107 S.Ct. at 2337; *Mitsubishi v. Soler Chrysler–Plymouth,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985); *Cone Memorial Hosp.,* 460 U.S. at 25, 103 S.Ct. at 941. Consequently, when it comes to interpreting arbitration agreements, "as with any other contract, the parties' intentions control, but those intentions are generously contrued as to issues of arbitrability." *Mitsubishi,* 473 U.S. at 626, 105 S.Ct. at 3353. Doubts concerning the scope of arbitrable issues are to be resolved in favor of arbitration. *Cone Memorial Hosp.,* 460 U.S. at 24–25, 103 S.Ct. at 941–942; *Coudert v. Paine Webber,* 705 F.2d 78, 81 (2d Cir.1983).

Here, petitioners seek to compel arbitration of respondent's charges though they are not signatories to the Customer Agreement. As with any other contract, a contract containing an arbitration provision may be binding on non-signatories where that was the parties' intent. *See McPheeters,* 953 F.2d at 772. The relevant inquiry, then, is whether petitioners and respondent agreed to arbitrate, under general principles of contract construction; that is, did W.J. Nolan and Midway intend to submit their disputes to arbitration. Petitioners argue that they did and we agree.

The Customer Agreement outlines the functions, legal rights and liabilities of the introducing broker and the clearing broker and explicitly separates the two. This boilerplate agreement is routinely used by Prudential when it acts as both the introducing and clearing broker for a client. However, in Midway's case, Prudential did not assume this dual role. Prudential acted only as respondent's clearing broker, while W.J. Nolan acted as its introducing broker; that is, petitioners (1) opened, approved and monitored respondent's account, (2) reviewed the account and orders, (3) supervised the investment advice given to respondent, (4) accepted respondent's orders, and (5) executed transactions on behalf of respondent.

The Customer Agreement's language clearly demonstrates that it was intended to apply to the introducing broker, independent of the clearing broker. Specifically, paragraphs 3, 5, 6 and 7 set forth responsibilities that fall exclusively to W.J. Nolan as introducing broker. And although W.J. Nolan's name does not appear on the letterhead because Prudential's agreement was used, W.J. Nolan's New York branch office and account number are explicitly referenced on the face of the Customer Agreement. It is obvious that respondent was well aware that W.J. Nolan was its introducing broker and intended the Customer Agreement to bind W.J. Nolan and govern its performance.[5]

The arbitration clauses contained in the Agreement further illustrate the parties' intent to submit their disputes to arbitration. The first clause, contained in paragraph 11, provides in relevant part: "The undersigned

---

**5.** In this connection, Prudential also sent a Correspondent Allocation of Responsibility letter to respondent to clarify the division of labor between Prudential and W.J. Nolan. This letter states: "Prudential Securities Incorporated ("PSI") is not your broker. PSI is your broker's clearing firm." It then lists the responsibilities of the introducing broker, W.J. Nolan.

agrees, and *by carrying an account for the undersigned you agree,* all controversies which may arise between us ... shall be determined by arbitration." (Emphasis added). It is uncontroverted that W.J. Nolan was the only party involved in the transactions that "carried an account" for respondent, as that expression is used in the securities industry. Introducing brokers, rather than clearing brokers, are frequently referred to as carrying firms for this reason. Thus paragraph 11's arbitration clause is specifically directed at the introducing broker—W.J. Nolan.

The second arbitration clause, also contained in paragraph 11, provides in relevant part: "Any controversy arising out of or relating to my account, *to transactions with or for me* or to this Agreement ... shall be settled by arbitration...." (Emphasis added). Again, it appears from the undisputed facts that W.J. Nolan was the sole party handling "transactions" for respondent. Like the clause cited above, the second arbitration clause contemplates arbitration of controversies with the introducing broker.[6]

Respondent argues that *McPheeters v. McGinn, Smith & Co., Inc.,* 953 F.2d 771 (2d Cir.1992), not only controls, but "disposes of" petitioners' arguments in this case. We disagree. In *McPheeters,* the Second Circuit determined that a broker who was not a signatory to an agreement between a customer and a clearing broker could not avail itself of the agreement's arbitration clause. However, *McPheeters* did not create a *per se* rule that non-signatories in such situations could never receive arbitration, as respondent suggests. To the contrary, the Court held that "under general contract principles, we may deem non-signatories to fall within the scope of an arbitration agreement *where that is the intent of the parties.*" 953 F.2d at 772 (citations omitted) (emphasis added). The Court then concluded, "[t]he Agreement, however, indicates no such intent." *Id.* at 773. This was because the agreement in

*McPheeters* referred to the non-signatory broker "only where necessary to explain the relationship between [the clearing broker] and [the customer]." *Id.*

As explained above, the Customer Agreement in the instant case goes well beyond elaborating the relationship between the customer (Midway) and the clearing broker (Prudential). It directly and explicitly enumerates the obligations and liabilities of the introducing broker. Further, unlike in *McPheeters,* the arbitration clause in Prudential's Customer Agreement defines "you" as the firm "carrying an account for the undersigned." *See McPheeters,* 953 F.2d at 774. This can only mean petitioners.

Thus, in keeping with the Second Circuit's emphasis on the parties' intent, we hold that W.J. Nolan is party to the Customer Agreement and entitled to enforce it. The petition to compel arbitration is accordingly granted.

SO ORDERED.

### ORDER

In accordance with the accompanying opinion, petitioners' petition to compel arbitration in the above-captioned case is hereby granted, and respondent's motion to dismiss said petition, or, in the alternative, to transfer it to the Eastern District of Virginia, is denied.

SO ORDERED.

---

6. Paragraph 9 of the Customer Agreement also contains a clause providing that it shall "inure to the benefit of [Prudential's] successors and assigns." On August 14, 1995, Prudential did in fact assign the Customer Agreement to W.J. Nolan, as of July 23, 1991. These circumstances indicate that W.J. Nolan can be considered an assignee of the Customer Agreement, in addition to an intended party, given that only a manifestation of intent is necessary to effect assignment. *See* Restatement (Second) of Contracts, section 317(1) (1981) Farnsworth at section 11.3.